**Peggy NUGENT, Plaintiff,**

**v.**

**The ROGOSIN INSTITUTE, Defendant.**

**Civil Action No. 98–CV–7192 (DGT).**

United States District Court,
E.D. New York.

July 6, 2000.

Thomas F. Bello, Staten Island, NY, for Plaintiff.

Joshua A. Goldberg, Patterson, Belnap, Webb, & Tyler, New York City, for Defendant.

### MEMORANDUM AND ORDER

TRAGER, District Judge.

Defendant Rogosin Institute, Inc. ("Rogosin") has moved for summary judgment against plaintiff Peggy Nugent ("Nugent"). Nugent sued Rogosin, her former employer, for terminating her employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1201 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and the New York City Administrative Code § 8–107(1)(a) ("NYCAC"). Nugent claims that the chemicals used in her work environment caused her to develop allergic asthma, which eventually led to the illegal termination of her employment.

### Background

### (1)

Rogosin is "a private not-for-profit medical research and health center" that operates the Rogosin Kidney Center ("RKC") in Manhattan. *See* Def.'s Statement Pursuant to Local Civ. R. 56.1(a) ¶ A.1 [hereinafter Def.'s 56.1]. Patients come to RKC to receive kidney dialysis treatment, a process by which toxins are cleansed from the patients' blood. *See id.* ¶ A.3.

Nugent began working for Rogosin as an assistant head nurse at RKC in March of 1992. *See* Declaration of Lisa E. Cleary dated Feb. 25, 2000 [hereinafter Cleary Decl.], Ex. A at 13 (Dep. of Peggy Nugent) [hereinafter Nugent Dep.]. Her duties as assistant head nurse included direct patient care and consultation with physicians, as well as administrative tasks, such as staff scheduling and management meetings. *See id.* at 15–16. According to her first, sixty-day evaluation, Nugent's performance as an assistant head nurse "Exceed[ed] Standards" in every category. *See* Cleary Decl., Ex. E ("Progress Report on New Employee" dated June 24, 1992). In fact, only five months after she started working at RKC, she was approached Administrator Joanne McDarby ("McDarby") about an available head nurse position. *See* Nugent Dep. at 20. This promotion was officially offered to Nugent during a lunch meeting attended by McDarby, Dr. John Sullivan ("Dr. Sullivan"), RKC's Medical Director, and Larry Maglione ("Maglione"), RKC's Chief Financial Officer. *See id.* at 21.

Nugent accepted the promotion and was designated Head Nurse of RKC in February of 1993. *See* Nugent Dep. at 24–25,

186. She testified that her responsibilities "changed greatly" after she was promoted to Head Nurse. *See id.* at 21. Although she continued to spend at least one or two hours a day in the dialysis unit making rounds with the charge nurse, talking with patients and doctors, and visiting the resident social workers and dieticians, *see id.* at 22–23, most of her daily tasks were "much more managerial" and administrative, *see id.* at 21. According to her own testimony, however, visiting the dialysis unit remained an essential component of her job. *See id.* at 117, 124–25.

From early 1993 until the summer of 1996, Nugent's performance evaluations reflected that she was satisfactorily executing her duties as Head Nurse, and handwritten comments made by McDarby and Nugent herself reveal that everyone was happy with Nugent's employment at RKC. *See, e.g.,* Cleary Decl., Ex. E ("Annual Management Performance Review" ("AMPR") dated June 1993); *id.* (AMPR dated June 1994); *id.* (AMPR dated June 1995). Nugent characterized her working relationship with Dr. Sullivan as "excellent" throughout her tenure at RKC and her working relationship with McDarby as "very, very good," until the summer of 1996, when an incident unrelated to this case put a strain on their friendly working relationship. *See* Nugent Dep. at 26.[1]

### (2)

At RKC, the filter used during a patient's dialysis (a "dialyzer") is flushed with saline and transported to the "reuse room" as soon as the treatment is finished. *See* Cleary Decl., Ex. B at 10 (Dep. of Dr. John F. Sullivan) [hereinafter Sullivan Dep.]. The structural integrity of each filter is then checked, and if sound, the filter is "filled with a sterilant called glutaraldehyde" and stored until the patient's next treatment. *Id.* The same filter will continue to be used by the same patient until it is damaged or has been used thirty times. *See id.*

When Nugent was promoted to Head Nurse in February of 1993, she was given an office located near the reuse room. Nugent's office was an L-shaped room, measuring approximately six feet by seventeen feet. *See* Sullivan Dep. at 28; *see also* Cleary Decl., Ex. C (blueprints of the second floor of RKC). The door to her office was about five feet away from the reuse room door, and her desk was about twenty to twenty-five feet away from the reuse room door. *See* Sullivan Dep. at 17. Although discovery lasted approximately nine months, Nugent has not produced any evidence regarding the ventilation of the reuse room, except her own statement that a co-worker told her "everything was properly ventilated" and that RKC had "never been cited" by any regulatory agency. Nugent Dep. at 96. Nugent also stated that the door to the reuse room was generally shut, but "[i]t wasn't closed tightly." Nugent Dep. at 97. RKC has used glutaraldehyde in its reuse room throughout the entire term of Nugent's employment. *See* Def.'s 56.1, ¶ B.13.

---

1. In the middle of June 1996, Nugent was out of work "sick" for three and one half days. *See* Cleary Decl., Ex. F (attendance record for 1996). When she returned to work, Nugent presented McDarby with a note from Dr. Tarantola (a pulmonary and internal medicine doctor) which read: "Miss Nugent is under My Care, Medication & bedrest is advised. She may Return to work on 6/24/96." *Id.* (note from Dr. Tarantola of 6/18/96). However, when McDarby questioned Nugent regarding the nature of her illness, Nugent confessed that she had been absent from work because she was going through "a very bad breakup with a boyfriend," *see* Nugent Dep. at 27, not because she was physically ill. *See id.* at 26–28. According to Nugent, McDarby then refused to accept Dr. Tarantola's excuse note and expressed disappointment in Nugent's dishonest behavior. *See id.* at 28. After this exchange, the warm relationship Nugent and McDarby had previously enjoyed disappeared, *see id.* at 28–29, a disintegration Nugent believes is evidenced in the less-than-stellar evaluation McDarby gave Nugent later that same month, *see* Cleary Decl., Ex. E (AMPR dated June 1996); *see also* Nugent Dep. at 53–63 (Nugent discussing AMPR dated June 1996).

(3)

In the fall of 1996, Nugent suddenly began experiencing breathing problems while at work. According to Nugent, an hour after she arrived at work on Friday, October 18th, she began to lose her voice, feel short of breath, and have chest tightness. *See* Nugent Dep. at 75. She was able to complete that work day, but couldn't get out of bed all weekend. *See id.* at 76. By Monday morning (October 21), Nugent was still experiencing "very, very bad shortness of breath," so she called into work sick and went to see Dr. Tarantola. *See id.*

Dr. Tarantola ordered blood work, a chest x-ray, and a pulmonary function test, all of which were within normal limits. *See* Supplemental Decl. of Lisa E. Cleary dated Apr. 28, 2000 ("Cleary Suppl. Decl."), Ex. I (Letter from Dr. Tarantola of 4/15/97) [hereinafter Tarantola Ltr.]. Dr. Tarantola explained to Nugent that she was suffering from a bronchial inflammation, and he questioned her about the chemicals used in her work environment in an attempt to determine if "the irritants in the reuse room [ ] caused this reaction." *See* Nugent Dep. at 77–78. Dr. Tarantola also prescribed a variety of bronchial inhalers for Nugent's daily use. *See* Tarantola Ltr. Nugent did not return to work at all that week (October 21st–25th), as she continued to feel very short of breath. *See* Nugent Dep. at 79; Cleary Decl., Ex. F (1996 attendance record).

On Monday, October 28, 1996, Nugent's shortness of breath had improved, and she returned to work. *See* Cleary Decl., Ex. F (1996 attendance record). She spoke to McDarby, Dr. Sullivan, and Maglione about her recent illness and explained that Dr. Tarantola felt that the chemicals used in the reuse room might be causing her breathing problems. *See* Nugent Dep. at 82. Nugent testified that McDarby expressed doubt in Dr. Tarantola's diagnosis

because "she never heard of anybody being sick from [the chemicals used]." *Id.* at 83. However, it appears that at least three other employees at RKC had adverse reactions to working in or near the reuse room: Bernice McCarthy, a technician who worked with the dialysis patients, who requested that she be assigned to work in sections of the unit that were not close to the reuse room because the fumes triggered her asthma; and Maria Casiano and Juan "Tony" Santiago, both of whom requested to be returned to their positions as unit clerks after they tried working as reprocessing technicians in the reuse room but suffered adverse physical reactions to the chemicals used. *See id.* at 85–90; Sullivan Dep. at 11–14. It appears that RKC honored the requests of these three employees by ensuring that their jobs did not require them to work in or near the reuse room. *See id.*

In October of 1996, Nugent also gave Dr. Sullivan permission to speak directly with Dr. Tarantola regarding her condition. *See* Sullivan Dep. at 19. Dr. Sullivan testified that he called Nugent's doctor and questioned him regarding "the cause or etiology of her breathing problems." *Id.* at 19. Dr. Tarantola responded that he believed Nugent was suffering from "some sort of reactive bronchitis," but that he had no idea if the chemicals used in the reuse room had anything to do with it. *Id.* at 19–20.

Although she completed her work day on Monday, Nugent was again out sick for three days October 29th–31st, returned to work Friday, November 1st,[2] and then was out on a vacation to Aruba the week of November 4th–8th. *See* Cleary Decl., Ex. F (1996 attendance record); Nugent Dep. at 108.

Within an hour of returning to work on Monday, November 11th, Nugent again "had the burning in [her] chest, chest

---

**2.** Dr. Tarantola provided Nugent with an undated note which read: "Peggy may return to

work on 11/1/96." Cleary Decl., Ex. F.

tightness, [and] shortness of breath." Nugent Dep. at 91; 183–84. She spent most of that day and the next (Tuesday, November 12th) in her office, although she also went into the unit. *See id.* at 91–92. She did not go into the reuse room Monday or Tuesday. *See id.* On Wednesday, Nugent's symptoms became more severe, and Maglione encouraged her to go see her doctor and not return to work until she was positive she was better. *See id.* at 94. Thus, Nugent left RKC Wednesday afternoon, November 13, 1996 and did not return until February 10, 1997. *See id.* at 177–83; Cleary Decl., Ex. F ("Payroll and Attendance Record Authorization For Year 1997") [hereinafter 1997 Attendance Record]. During this three month leave of absence, Nugent's responsibilities were assumed by the assistant head nurse. *See* Nugent Dep. at 103.

(4)

On January 29, 1997, Dr. Tarantola cleared Nugent to return to work in a letter which listed her current medications (inhalers), but did not place any restrictions on her work conditions. *See* Cleary Suppl. Decl., Ex. J; Nugent Dep. at 236. Nugent returned to RKC on Monday, February 10, 1997. *See* 1997 Attendance Record. As before, after returning to work for only an hour, she began exhibiting symptoms: burning and tightness in her chest and shortness of breath. *See* Nugent Dep. at 111–12; 120. Wednesday night, Nugent saw Dr. Tarantola, who told her that she should not return to work at all, because he believed her lungs were being damaged. *See id.* at 104. After responding that she could not afford to be out of work, Nugent suggested to Dr. Tarantola: "Well, what if I asked to have my

office changed to the other side of the unit not so close to the reuse room so for the times that I am in my office, if this is indeed what's bothering me, maybe that will lessen it." *Id.* at 104. According to Nugent, Dr. Tarantola's reply was noncommital: "[H]e said to try. He says, 'Maybe if you have been moved—if your office was moved away from [the reuse room], you know, maybe you will feel better.'" *Id.* at 110, 221.

The next morning, Thursday, February 13, 1997, Nugent returned to work and asked McDarby if she would schedule an appointment with Dr. Sullivan to discuss switching offices with either the dieticians or the social workers. *See id.* at 104. Both of these offices are located on the other side of the unit from the reuse room. *See* Cleary Decl., Ex. C.[3] According to Nugent, McDarby immediately refused to even consider such a move and suggested Nugent see another doctor, because "moving [her] office was not going to change a thing." Nugent Dep. at 105. Nugent was shocked by McDarby's reaction to her request and did not say anything in response. *See id.* McDarby then walked away. *See id.*

A few minutes later, Nugent was called into McDarby's office, where the two women were joined by Dr. Sullivan. *See id.* at 105. Nugent testified that she reiterated her request to be moved to another office and explained that she was not sure the move would have any effect; if it did not alleviate her symptoms, she would be forced to resign. *See id.* at 105, 187–88. McDarby responded that Nugent's office was not going to be moved; instead, she was being fired. *See id.*[4]

---

3. Office 2068, which was shared by two full-time social workers, was 10'5″ × 10'11″, somewhat larger than Nugent's 6' × 17' office. *See* Sullivan Dep. at 28–29; Nugent Dep. at 253, 255. Office 2066 was occupied by RKC's two full-time dieticians and, while it has almost the same square-footage as Nugent's office (8'5″ × 10'11″), it is square, not L-shaped. *See id.*

4. Dr. Sullivan's account of this meeting varied from Nugent's. *See* Sullivan Dep. at 23–24. He recalled that Nugent told him that she was unable to work in the unit anymore because of her breathing problems. *See id.* at 23. According to Dr. Sullivan, McDarby responded that RKC had been without a Head Nurse for a few months and could not continue operating without one. *See id.* Additionally, Sullivan denied that Nugent asked him if

That same day, a "Personnel Notice of Termination" was completed by McDarby, signed by Nugent, and placed in her file. *See* Cleary Decl., Ex. H. The notice recites that Nugent was terminated from the position of Head Nurse at RKC on February 13, 1997 for health reasons. *See id.* at 2. McDarby also indicated that Rogosin would be willing to hire Nugent again when and if she recovered from her illness. *See id.* at 3. Dr. Sullivan confirmed this sentiment by stating during deposition that Nugent's performance before she got ill was "very good" and that "if she had not had the breathing problem, she would have remained as the head nurse in the unit." Sullivan Dep. at 31–32.

### (5)

One month after being fired by Rogosin, Nugent secured a position as Head Nurse at Richmond Kidney Center ("Richmond"). *See* Nugent Dep. at 33. (Richmond uses disposable filers and does not use glutaraldehyde or any other sterilant. *See id.* at 39.) Her salary in 1998, including overtime, was approximately $51,000, *see id.* at 36, as compared with $64,000—her salary when terminated from Rogosin, *see id.* at 34. Other employee benefits are comparable. *See id.* at 37–38. From March of 1997 through October of 1999, Nugent took less than ten sick days at Richmond three of which were due to asthma and the rest of which were due to migraine headaches. *See id.* at 41–42.

Nugent has a current diagnosis of "allergic asthma." *See id.* at 239–40. She testified that she feels sick when exposed to bleach and other types of strong cleaning chemicals. *See id.* at 100, 107. She stated that she is unable to walk great distances or exercise vigorously. *See id.* at 127. She also has to be careful about going into public places where there may be a lot of smoke or strong chemicals that could trigger an attack. *See id.* She also regularly takes medication—a long-acting bronchol-

dilator in pill form and a steroid inhaler twice a day. *See id.* at 128–29.

### (6)

On June 10, 1997, Nugent filed a charge of discrimination against Rogosin with the EEOC. In her charge she stated that she had been unable to work at Rogosin from October 21 to November 14, 1996 due to asthma. *See* Nugent Dep. at 246. Additionally, she stated in her charge that her doctor had advised her to change the location of her office, a statement she admitted during deposition is inaccurate. *See id.* On August 27, 1998, the EEOC issued Nugent a "Notice of Right to Sue," since more than 180 days had passed since her charge was filed and no action had been taken by the EEOC. *See* Compl., Ex. A. This suit was subsequently filed on November 18, 1998.

### Discussion

Summary judgment is appropriately granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Rogosin has moved for summary judgment on the ground that plaintiff has failed to establish two of the four elements necessary to prove a prima facie case of employment discrimination under the ADA. In order to assert an ADA claim, a plaintiff must initially show: (1) that the defendant employer is subject to the ADA; (2) that the plaintiff suffers from a qualifying disability; (3) that the plaintiff could perform the essential functions of the job with or without reasonable accommodation; and (4) that the plaintiff was fired because of a disability. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998). Rogosin does not dispute it is an employer subject to the ADA; nor does it dispute

her office could be changed, *see id.* at 24; although he admitted that if she had asked him, he would have refused since Nugent's

office was too small to contain the two employees who would be necessarily displaced, *see id.* at 24–25.

Nugent was fired due to her physical inability to work at RKC. Instead, Rogosin maintains that: (1) Nugent does not suffer from a qualifying disability because her asthma does not substantially limit any of her major life activities; and (2) even if she had a qualifying disability, she was unable to perform the essential functions of her position as Head Nurse, even with reasonable accommodation.

## (1)

### Qualifying Disability

■ Mirroring the Supreme Court's analysis in *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Second Circuit has established a three-step analysis to determine whether a plaintiff suffers from an impairment that substantially limits a major life activity and, thus, has a qualifying disability under the ADA. *See Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 641 (2d Cir. 1998). First, the court must determine whether plaintiff has a physical or mental impairment. *See id.* Second, the court must identify the activity claimed to be impaired and determine whether that is a "major life activity" under the statute. *See id.* Finally, plaintiff must show that the major life activity is substantially limited by the impairment. *See id.* All three criteria must be met or a plaintiff's ADA claim must be dismissed.

■ In the instant case, there can be no dispute that asthma is a physical impairment as defined by the ADA, since it is a physiological disorder or condition which affects the respiratory system, one of the bodily systems listed in the statute. *See* 29 C.F.R. § 1630.2(h)(1); *Heilweil v. Mt. Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994) (finding asthma to be a physical impairment under the Rehabilitation Act).[5] Moreover, Nugent seeks to establish that asthma impaired her ability to work and to breathe, both of which are specifically included in the regulatory definition of "major life activities," *see* 29 C.F.R. § 1630.2(i). Thus, the only question that remains to be answered is whether Nugent's asthma substantially limits either of these two major life activities.

Two recent Second Circuit cases are particularly helpful in answering this question. In *Heilweil*, 32 F.3d at 718, and in *Muller v. Costello*, 187 F.3d 298 (2d Cir. 1999), the Court of Appeals found that the plaintiffs' asthmatic conditions did not substantially impair any of their major life activities. The facts of both of these cases closely resemble the facts of the instant case. Specifically, the plaintiff in *Heilweil* was hired as a manager by defendant Mt. Sinai Hospital and, after a year of satisfactory work performance, was transferred to oversee the hospital's blood bank. *See* 32 F.3d at 719. Soon after plaintiff was transferred to the blood bank, however, she began experiencing asthma-like symptoms which her doctor believed were caused by the building's poor air quality. *See id.* at 720. Plaintiff's condition seemed to improve when she was not at work and worsen when she was in the building; thus, her doctor recommended that she stay away from the facility altogether. *See id.* Mt. Sinai agreed to allow plaintiff to manage the blood bank from an off-site location, but only until a replacement manager could be found. *See id.* When the transition was complete, plaintiff was discharged. *See id.*

The Second Circuit held that plaintiff was not protected by the Rehabilitation Act because none of her major life activities were substantially limited by her asthma. *See id.* at 724. The fact that the blood bank's poor air quality caused plaintiff to experience breathing problems which prevented her only from working in

---

**5.** A plaintiff seeking to establish a prima facie case of discrimination under the Rehabilitation Act must make the same showings as a plaintiff bringing a case under the ADA, with the additional showing that the defendant employer receives federal financial assistance. *Compare Heilweil*, 32 F.3d at 722 (Rehabilitation Act) *with Ryan*, 135 F.3d at 869–70(ADA).

the blood bank did not establish a substantial limitation in either her ability to work or to breathe. *See id.* Relying on plaintiff's deposition testimony that her breathing improved when she was away from the blood bank and that she was able to exercise, the court found that asthma did not substantially limit her breathing, but instead only restricted it "in a limited way." *Id.* at 723. Moreover, plaintiff's physical impairment was not found to have limited her employment ability generally, but only with respect to working in one place—the hospital's blood bank. *See id.* at 724. Therefore, plaintiff's asthma did not qualify as a "handicap" under the Rehabilitation Act. *See id.*

Similarly, last year in *Muller*, the Second Circuit confirmed that an employee who is prevented from working at one specific job due to a physical impairment is not disabled under the ADA. *See Muller*, 187 F.3d at 298. In *Muller*, plaintiff was a correctional officer who had "severe bronchitis with a strong asthmatic component" that was aggravated by tobacco smoke. *See id.* at 302–03. Even though plaintiff provided his employer with multiple doctor's notes requesting he be assigned to work in smoke-free areas of the prison, he was not given the requested assignments all the time. *See id.* at 302–06. After being exposed to smoke on the job, plaintiff would become ill and have to stay out of work for days or weeks at a time. *See id.* Plaintiff was eventually suspended from his job without pay. *See id.* at 306. He sued under the ADA and obtained a jury award. *See id.*

However, contrary to the findings of the jury and the district judge, the Second Circuit found the evidence in *Muller* insufficient to establish that plaintiff's breathing problems substantially limited his ability to work or to breathe. Quoting an EEOC regulation that requires a person be "significantly restricted in the ability to perform a broad range of jobs in various classes" in order to be impaired in the major life activity of working, 29 C.F.R.

§ 1630.2(j)(3)(i), the Court of Appeals found that plaintiff's inability to work as a corrections officer at his former facility, and any other facility that permitted smoking, did not meet this EEOC definition. *Id.* at 313. The court held that the "limitation on a single, particular job cannot constitute a substantial limitation in the major life activity of working." *Id.* Moreover, citing *Heilweil* as support, the court found that plaintiff's asthma attacks, induced by on-the-job allergens, were not sufficiently frequent or severe to qualify as substantially limiting his ability to breathe. *See id.* at 314.

Numerous other courts have similarly held that an asthmatic condition which only prevents plaintiff from working at one job, or a narrow category of jobs, is not a qualifying disability under the ADA or the Rehabilitation Act. *See, e.g., Gupton v. Virginia*, 14 F.3d 203, 205 (4th Cir.1994) (plaintiff's allergy to tobacco smoke, which only prevented her from working for defendant, was not a qualifying disability); *Maulding v. Sullivan*, 961 F.2d 694, 698 (8th Cir.1992) (asthmatic condition, which was triggered by chemicals and prevented plaintiff from working as a pharmacologist, was not a qualifying handicap); *Bellom v. Neiman Marcus Group, Inc.*, 975 F.Supp. 527, 533–34 (S.D.N.Y.1997) (plaintiff's asthma, which only prevented her from working in defendant's cosmetics department, was not a qualifying disability); *Castro v. Local 1199*, 964 F.Supp. 719, 725 (S.D.N.Y. 1997) (asthmatic condition, which was exacerbated by extreme temperature changes and prevented plaintiff from being a union representative, was not a qualifying disability).

These precedents compel the conclusion that Nugent's asthma attacks, which were apparently triggered primarily by allergens present at RKC and only prevented her from working at RKC, cannot be found to substantially limit her ability to work or to breathe. Plaintiff's own testimony makes clear that both she and her doctor believe her asthmatic condition was a reac-

tion to the specific sterilant used at RKC. While this condition prevented Nugent from being able to maintain her position as Head Nurse at RKC, it did not prevent her from securing a similar position less than a month later with a company that does not use the sterilant. Further, she has been able to work at her new job without extended periods of absenteeism. Nugent's ability to secure and successfully perform a comparable job makes clear that her physical impairment did not substantially limit her ability to work, but only her ability to work for Rogosin. The ADA does not provide protection in such a situation.[6]

Similarly, plaintiff has produced no evidence to show that her asthma significantly limited her ability to breathe outside the workplace. On the contrary, plaintiff testified during deposition that her ability to breathe was impaired when she entered Rogosin's facility and improved when she stayed away from her job. While plaintiff's symptoms may have also occasionally been triggered by exposure to a smoke-filled room or a strong household cleanser, there is no evidence that Nugent's daily activities were significantly hindered due to her asthma. Accordingly, no reasonable jury could conclude that Nugent was substantially limited in her ability to breathe during the time she was employed by Rogosin.

Thus, because Nugent was not substantially limited in either her ability to work or to breathe during the time she was employed by Rogosin, she is not, as a matter of law, a person with a qualifying disability under the ADA.

### (2)

### Essential Functions of the Job

If Nugent's allergic asthma had substantially limited one of her major life activities, thus making it a qualifying disability, she would still have to establish that she

was able to perform the essential functions of her job with or without reasonable accommodation. *See Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137 (2d Cir. 1995). This is a much closer question.

Plaintiff strenuously argues that Nugent's request that her office be relocated away from the reuse room was reasonable. On its face, it the argument does seem plausible, especially in light of Rogosin's prior experience with three other employees who had similar asthmatic complaints when exposed to glutaraldehyde, but who continued to successfully perform their jobs once removed from the areas of the unit adjacent to the reuse room.

On the other hand, it is not clear how that relocation would have accommodated Nugent's physical impairment and made her able to perform the essential functions of her position as Head Nurse. According to Nugent's own testimony, in addition to completing paperwork in her office, her job required her to circulate throughout the dialysis unit, checking on patients and consulting with nurses and physicians. While one may assume that relocating Nugent's office might have alleviated the amount of irritant she was exposed to while sitting in her office, it is not clear how moving her office would have reduced to a tolerable level the fumes she was exposed to during the hours she spent in the unit each day. This is especially true in light of Nugent's testimony that she would begin to experience debilitating symptoms almost immediately after entering RKC.

Still, it is troublesome that RKC refused to even consider Nugent's request to switch offices. A trial relocation might well have saved the job of a concededly qualified and able employee. Nevertheless, this issue need not be resolved since defendant had no duty to reasonably accommodate plaintiff since she did not have a qualifying disability under the ADA.

---

**6.** Whether the result would be the same if all dialysis centers used the chemicals utilized by RKC and if plaintiff's nursing skills and train-
ing only qualified her for a position at a dialysis center is an issue that need not be reached here.

### (3)

Finally, claims brought under NYSHRL and NYCAC are generally analyzed according to the same standard as an ADA claim. *See, e.g., Ryan,* 135 F.3d 867. Thus, it follows that summary judgment should be granted on the plaintiff's NYSHRL and NYCAC claims, as well as on her ADA claim. Recently, however, the Second Circuit noted that "the definition of 'disability' in the NYSHRL, as construed by the New York Court of Appeals, is broader than that of the ADA." *Reeves v. Johnson Controls World Servs.,* 140 F.3d 144, 147 (2d Cir.1998). In *Reeves,* the court focused on the NYSHRL's definition of disability which reads, in relevant part: "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292(21).[7] Under this definition, the Second Circuit found that a plaintiff's mental impairment—Panic Disorder with Agoraphobia— was not a qualifying disability under the ADA, but was a disability within the meaning of the NYSHRL, since it was "demonstrable by medically accepted clinical or laboratory diagnostic techniques." *Reeves,* 140 F.3d at 156.

However, here, neither of the parties discusses the NYSHRL or NYCAC claims apart from the ADA claim, and plaintiff did not explore the issue of whether Nugent has a qualified disability under these New York laws, even though she does not under the ADA. Thus, there is no reason to exercise supplemental jurisdiction over plaintiff's NYSHRL and NYCAC claims. *See Scott v. Flaghouse, Inc.,* 159 F.3d 1348, 1998 WL 536764, at *2 (2d Cir.1998) (Table) (relying on *Reeves* to vacate summary judgment of NYSHRL claims, but then dismissing NYSHRL claims because no

federal claim survived summary judgment).

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close the case.

SO ORDERED.

---

7. NYCAC contains a similar definition of "disability": "any physical, medical, mental or psychological impairment, or a history or record of such impairment." NYCAC § 8-102(16)(a).