**Donald MURPHY, Plaintiff,**

v.

**BOARD OF EDUCATION OF THE ROCHESTER CITY SCHOOL DISTRICT, et al., Defendants.**

**No. 00–CV–6038L.**

United States District Court,
W.D. New York.

July 10, 2003.

Emmelyn Logan–Baldwin, Rochester, NY, for Plaintiff.

Maureen T. Alston, Harter, Secrest and Emery LLP, Jules L. Smith, Blitman & King, Rochester, NY, for Defendants.

### DECISION AND ORDER

LARIMER, District Judge.

## INTRODUCTION

*"Parvis e glandibus quercus"*: "tall oaks from little acorns grow." Like the proverbial oak tree, this case has grown from a simple employment dispute over one teacher's interschool transfer, into a gargantuan, broad-based campaign against an entire school system. Although an oak tree, as a provider of shade and a symbol of strength, might seem an inapt simile for this torturous case, it is fitting in another sense as well, for the mountains of paper that have been expended in this litigation probably amount to a good-sized tree's worth. It is more than unfortunate that what should have been a straightforward case involving a discrete set of facts and a few individuals has been transformed into a vehicle by which plaintiff Donald Murphy ("Murphy") and his attorney have sought to launch a virtual crusade, involving nearly every aspect of plaintiff's employment (and a good many things that have nothing at all to do with plaintiff or his employment), against his employer, the Rochester City School District ("RCSD" or "the District"), plaintiff's labor union, and over two dozen individuals, thereby necessitating

the expenditure of untold resources by the parties, their attorneys, and this Court.

This action is part of a group of cases against the Rochester City School District and other defendants, filed by the same attorney, alleging a host of civil rights violations and other unlawful acts of every stripe against the plaintiffs, all of whom are or were teachers employed by the RCSD. Several of those actions have been dismissed after the Court granted summary judgment in favor of the defendants. *See Seils v. RCSD*, 192 F.Supp.2d 100 (W.D.N.Y.2002), and *Bliss v. RCSD*, 196 F.Supp.2d 314 (W.D.N.Y.2002) (dismissing three consolidated cases).[1] Defendants have moved for summary judgment in this action as well, and plaintiff has moved for "partial" summary judgment on the issue of liability, and for injunctive relief. Defendants' motions are granted and the complaint is dismissed.

## BACKGROUND

This action in some ways relates to another action, *Murphy v. Board of Educ. of RCSD*, 93–CV–6158L, filed a decade ago by plaintiff in 1993.[2] In that action, plaintiff, a teacher in the RCSD, sued the District, the Rochester Teachers Association ("RTA"), and six individuals, alleging various violations of his civil rights, as well as a number of claims under New York law, in connection with certain events that occurred in the late 1980s and early 1990s.[3] The Court dismissed that action in December 1997 after being informed by the parties that the case had settled.

In October 1999, however, plaintiff filed a motion seeking to vacate the Court's

dismissal order and to compel defendants to comply with the settlement agreement. In addition, plaintiff sought to file a "supplemental" complaint, and add additional parties. The Court denied that motion for lack of subject matter jurisdiction on December 16, 1999, on the grounds that the action was a contract dispute between two residents of New York and, therefore, there was no diversity or other basis for federal jurisdiction, stating that "[i]f plaintiff wishes to file a new action in federal court, he may do so assuming that he has the requisite federal jurisdiction and assuming such a complaint does not breach the terms of the settlement agreement between the parties." *Murphy v. Board of Educ. of RCSD*, 79 F.Supp.2d 239, 242 (W.D.N.Y.1999).

Plaintiff then filed this action on January 24, 2000. In addition to the RCSD and the RTA, plaintiff has also sued the Board of Education of the RCSD ("the Board"), the individual members of the Board (nine of whom are named in the complaint), and nineteen other individuals who either are or were employed by the RCSD or the RTA. The amended complaint, which was filed on January 27, 2000, asserts twelve causes of action, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. §§ 1983 and 1985(3); § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the New York State Human Rights Law ("HRL"), Exec. L. § 796; the New York Civil Rights Law ("CRL"); and several other theories under

---

1. Another similar action, *Matics v. RCSD*, 00–CV–6612, was voluntarily withdrawn by the plaintiff.

2. At that time, plaintiff was represented by a different attorney. His present attorney was substituted for his former counsel in September 1999.

3. The general factual background of that case was set out in an unpublished Decision and Order of this Court entered on November 30, 1993 (Docket # 26), in which I granted in part and denied in part the RTA's motion to dismiss some of plaintiff's claims against it.

New York common law and the New York Constitution. Plaintiff seeks a sweeping array of various forms of relief, including: a declaratory judgment; injunctive relief, together with a "mechanism for the enforcement of the injunctions" based upon a detailed plan to be drafted by defendants showing precisely how they will cease their alleged discrimination against plaintiff; back pay, front pay, and benefits; a whopping $1.75 million in "compensatory" damages; punitive damages; pre- and post-judgment interest; and attorney's fees and costs.

## DISCUSSION

### I. Summary Judgment—General Standards In Discrimination Cases

The standard for deciding summary judgment motions is well established. Rule 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Under the rule, the burden is on the moving party to inform the Court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'" *Id.* When reviewing the record to determine whether a rational fact-finder could find for the non-moving party, however, all reasonable inferences must be drawn in favor of the non-moving party. *Maguire v. Citicorp Retail Services, Inc.,* 147 F.3d 232, 235 (2d Cir.1998).

The general principles underlying a motion for summary judgment fully apply to discrimination actions. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000), *petition for cert. filed,* 71 U.S.L.W. 3680 (Apr. 17, 2003). Although courts are understandably cautious about granting summary judgment in cases where motive, intent or state of mind is at issue, *Montana v. First Federal Savings and Loan Ass'n of Rochester,* 869 F.2d 100, 103 (2d Cir.1989); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988), "the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *see also Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases"), *cert. denied,* 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 40 (2d Cir.1994) ("summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact"). Consequently, once the moving party has met its burden, the non-moving party in a discrimination action must come forward with evidence upon which a rational fact-finder could return a verdict in his favor. For a plaintiff in a discrimination case to survive a motion for summary judgment, he must do more than present

"conclusory allegations of discrimination," *Meiri,* 759 F.2d at 998; he must offer "concrete particulars" to substantiate his claim. *Id.*

## II. Plaintiff's Discrimination Claims Against the RCSD

### A. Claims Based on Plaintiff's Transfers, Assignments, Etc.

Plaintiff, a white male born in 1956, alleges that defendants have discriminated against him on account of his "race, and/or sex, and/or age, and/or national origin, and/or disability ...." Amended Complaint ¶ 45. It is difficult to say precisely how he alleges that defendants have done so, however, because in setting forth his allegations of discrimination plaintiff has managed to be simultaneously prolix and vague. Plaintiff has essentially catalogued every employment-related grievance (of which there are many) from December 31, 1997 to the time of the filing of the complaint and beyond, and alleged in conclusory fashion that these resulted from defendants' "policy, pattern, practice, custom and usage" of discriminating against whites, males, older employees, etc. Since plaintiff's papers for the most part do not differentiate between these claims, they will be discussed collectively.

I also note that while plaintiff alleges all these various types of discrimination, some of them (such as age discrimination)[4] receive scant, or no, mention in plaintiff's motion papers. This suggests that such claims are little more than boilerplate allegations that bear little or no relation to the facts of this case. This tack is also indicative of the scattershot approach taken by plaintiff. No instance of perceived ill treatment is too trivial to be listed among the alleged violations of plaintiff's rights, and every one of those instances is ascribed to discrimination, which in turn is asserted, in sweeping and conclusory fashion, to be based on plaintiff's membership in virtually every class protected by law: his sex, race, national origin, age, and alleged disability.

This alone does not mean, of course, that plaintiff's allegations are untrue. I suppose that it is possible that plaintiff has been unfortunate enough to be employed in a school district where virtually everyone in a position of authority, including his own union leaders, is extraordinarily prejudiced, against white people, men, older persons, and the disabled, not to mention persons of certain national origins.[5] It is even possible that defendants harbor such prejudices notwithstanding the fact that many of them fall into these very categories.[6] To survive summary judgment, however, plaintiff must present some *evidence* of such discrimination. He has failed to do so and, therefore, the complaint must be dismissed.

---

4. The complaint asserts a claim for age discrimination under the HRL, as well as "the laws of the United States and of the State of New York providing for injunctive and other relief from discrimination on the basis of ... age," Amended Complaint ¶ 5, but does not cite the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. ¶ 621 *et seq*. Aside from boilerplate references to age (and virtually every other type of) discrimination, plaintiff's papers make little mention of his claims of age discrimination. In any event, there is no basis to believe that he suffered any adverse employment action on account of his age, as will be made clear from the discussion of plaintiff's evidence concerning his alleged disparate treatment.

5. Plaintiff has described himself as a "native-born American of Irish ancestry." RCSD's Ex. 27.

6. Remarkably, despite this alleged systemic discrimination against whites, nearly three quarters of the teaching staff at Benjamin Franklin High School were white at the time of plaintiff's transfer from there in 1998. *See* Affidavit of Alessio Evangelista (Docket # 198) ¶ 50.

Plaintiff's discrimination claims are subject to the well-known burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. First, the plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 129 (2d Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997). In order to establish a prima facie case, plaintiff must show: (1) that he belongs to a protected class; (2) that he is qualified for his position; (3) that he suffered an adverse employment action; and (4) that the surrounding circumstances give rise to an inference of discrimination on the basis of his membership in that class. *Weinstock*, 224 F.3d at 42; *Chambers*, 43 F.3d at 37. If the plaintiff establishes the prima facie case, "the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason" for the adverse action. *Holt*, 95 F.3d at 129. If the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason is merely a pretext for discrimination. *See id.* "In order to survive a motion for summary judgment, at the third step plaintiff must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's ... [membership in a protected class] was the real reason" for the adverse action. *Id.*[7]

Although I am not convinced that plaintiff has even made out a prima facie case of discrimination, because he has not alleged "surrounding circumstances giv[ing] rise to an inference of discrimination on the basis of his membership" in a protected class, I will assume *arguendo* that he has done so, since defendants have proffered legitimate, non-discriminatory reasons for their actions. *See United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant"); *Wado v. Xerox Corp.*, 991 F.Supp. 174, 187 (W.D.N.Y.1998) (where defendant proffered legitimate, nondiscriminatory reasons for plaintiffs' terminations, court would "assume that [each plaintiff] ha[d]

---

**7.** As stated, in his race discrimination claim, plaintiff alleges so-called "reverse" discrimination, *i.e.*, discrimination on account of the fact that he is white. The Second Circuit "has applied the same burden-shifting to claims of 'regular' discrimination-*i.e.*, where the plaintiff is a member of a historically disfavored group-as well as to claims of reverse discrimination-*i.e.*, where the plaintiff is *not* a member of a historically disfavored group." *Vallone v. Lori's Natural Food Center, Inc.*, 199 F.3d 1324, 1999 WL 1012668, at *1 (2d Cir.1999) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 310, 311–12 (2d Cir.1997)) (applying burden-shifting analysis to claim, by male of Eastern European descent, that defendant university had denied him job because of "its overarching desire to appoint women and minorities to its faculty",

and *id.* at 320 n. 5 (Calabresi, J., dissenting) ("This case is a reverse discrimination suit and is based on the claim that Columbia discriminated in favor of Hispanics")). *See also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (holding that Title VII prohibits racial discrimination against whites upon the same standards as racial discrimination against non-whites); *Cully v. Milliman & Robertson, Inc.*, 20 F.Supp.2d 636, 640–41 (S.D.N.Y. 1998) (a white plaintiff does not have to fulfill a higher prima facie burden than a non-white plaintiff).

Although *Vallone* is an unreported case, I cite it not as binding precedent, but only for its observation-with which I agree-that the court in *Stern* applied the usual burden-shifting analysis to a reverse-discrimination claim.

made out a prima facie case, and proceed to consider whether the plaintiff ha[d] presented sufficient evidence to create a triable issue of fact about whether Xerox's proffered reason [wa]s a pretext for discrimination"), *aff'd*, 196 F.3d 358 (2d Cir. 1999). Because defendants have proffered such reasons (which will be discussed in more detail below), however, the burden is on plaintiff to come forward with sufficient evidence to give rise to an issue of fact about whether defendants' proffered reasons are pretextual.

■■■ Plaintiff has failed utterly to meet that burden. Many of his allegations concerning alleged discrimination do not even involve plaintiff directly. Instead, plaintiff goes on at length about alleged systemic (mostly race) discrimination throughout the RCSD, without relating these allegations to any action taken against plaintiff. For example, plaintiff asserts that "RCSD personnel have instructed that only RCSD *students* 'of color' be given invitations to participate in the RCSD's PRISM Program," Plaintiff's Rule 56 Statement ¶ 536 (emphasis added), which is a program intended to encourage students to pursue careers in medicine.[8] In addition, as in *Bliss*, plaintiff devotes considerable discussion to the District's alleged use of a methodology known as the "Singleton formula" in the hiring, placement and transfer of employees, but he proffers no evidence that he was in any way affected by the use of this formula. *See Bliss*, 196 F.Supp.2d at 327 (noting that plaintiff in that action "does not allege that she was adversely impacted by the

application of such formula within any of the last eleven years prior to the commencement of this action"). As both the Second Circuit and the Supreme Court have stated, however, "at an irreducible minimum, Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Vermont Right to Life Committee, Inc., v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)) (internal quotation marks omitted). Plaintiff therefore lacks standing to challenge the alleged use of the Singleton formula. Similarly, Murphy's complaints about the PRISM Program that affects students is irrelevant since it does not affect him.

This is not to say that evidence of discrimination against others can never be relevant to an individual's discrimination claim, but at some point there must be some logical connection drawn between that other discrimination and the alleged discrimination against the plaintiff. As I stated in *Seils*, plaintiff's allegations about racial discrimination within the RCSD "relate to matters occurring in other places, at other times, sometimes years previously and involving matters wholly unrelated to the claims at issue here." *Seils*, 192 F.Supp.2d at 115–16.

■■■ Equally unavailing is plaintiff's attempt to use "statistical" evidence to bol-

---

**8.** I note that, as in *Bliss* and *Seils*, plaintiff's counsel has wholly failed to comply with Local Rule 56, which provides that a party moving for summary judgment must attach to the notice of motion "a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." Plaintiff's Rule 56 statement is 159 pages long, and contains no less than 668 paragraphs. It is accompanied by 260 exhibits in seven separate volumes. In contrast, the District's and the RTA's Rule 56 statements are 19 and 10 pages long, respectively.

Plaintiff's counsel has apparently proceeded on the basis that the volume of her submissions will be equated with substance.

ster his claim.[9] Plaintiff cites the results of a study published by the Eric Clearinghouse on Teaching and Teacher Education, showing that in 1990–91, 9.2% of public school teachers in the United States were Black/African American, and 3.1% were Hispanic. Plaintiff's Rule 56 Statement, Ex. 241. Plaintiff also states that a review of the 2000 and 2001 yearbooks from Benjamin Franklin High School ("Franklin") (where plaintiff currently teaches) indicates that "[t]he new full time hires and transfers into the Franklin Career Academy are predominantly minorities—9 out of 15 persons," or 60%. Plaintiff's Rule 56 Statement ¶ 596. Plaintiff then argues that the disparity between that 60% figure and the 12% figure reported in the Eric Clearinghouse study "reflect[s] an ongoing pattern, practice, custom and usage of the RCSD and the RTA hiring and placing teachers by race or national origin." Plaintiff's Rule 56 Statement ¶ 597.

That plaintiff could even make such an argument is little short of astonishing. To compare the results of a 1991 nationwide study with a sampling of fifteen teachers[10] taken from a high school yearbook ten years later is absurd enough. *See Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 621, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (statistics regarding racial composition of thir-

teen-member school board nominating panel were meaningless); *Coleman v. Prudential Relocation,* 975 F.Supp. 234, 240 (W.D.N.Y.1997) (statistical evidence about reduction in force in which nine out of nineteen employees were terminated was meaningless due to small number of people involved). With no knowledge of the circumstances relating to the hiring or placement of those fifteen persons, however (such as who else applied for their positions), this "evidence" is probative of nothing whatsoever.

■ To the extent that plaintiff does discuss his own individual circumstances, his claim also fails for the simple reason that he has not presented evidence that would support a finding that he suffered any adverse employment action, under circumstances giving rise to an inference of discrimination. *Weinstock,* 224 F.3d at 42.

First, most of the acts of which plaintiff complains cannot reasonably be considered adverse for purposes of a discrimination claim. Plaintiff's major source of discontent appears to be his various transfers to and from certain schools, particularly his transfers to Thomas Jefferson Middle School ("Jefferson"), where plaintiff taught during several different periods of time. These various transfers and assignments over the years cannot be considered "ad-

**9.** Although the term "pattern and practice" does appear sporadically in plaintiff's papers, *see, e.g.,* Plaintiff's Reply Brief at 27, given the jumbled, disorganized nature of plaintiff's papers, it is difficult to tell if he means to assert a pattern-and-practice claim, which is typically established through statistical evidence. *See, e.g., Hazelwood School Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination"); *In re Western Dist. Xerox Litigation,* 850 F.Supp. 1079, 1084 (W.D.N.Y.1994) ("In general, 'a pattern or practice of disparate treatment is shown through a combination of sta-

tistical evidence demonstrating substantial disparities * * * buttressed by evidence of general policies or specific instances of discrimination' ") (quoting *E.E.O.C. v. Chicago Miniature Lamp Works,* 947 F.2d 292, 299 (7th Cir.1991)) (second internal quotes omitted). Regardless of whether plaintiff is attempting to assert such a claim, or whether his "statistics" are simply intended to bolster his claim of disparate treatment, this evidence is woefully inadequate.

**10.** It is unclear how plaintiff determined that nine of those teachers were minorities-from their physical appearance, their surnames, or by some other means.

verse," however. They may not have been to plaintiff's liking, but more than that is required. *See Hunt v. Rapides Health-care Sys., LLC,* 277 F.3d 757, 771 n. 8 (5th Cir.2001) ("the focus is on the objective qualities of the positions, rather than an employee's subjective preference for one position over another. That subjective preference, alone, is an insufficient basis for finding an adverse employment action"); *Davis v. Town of Lake Park, Florida,* 245 F.3d 1232, 1239 (11th Cir.2001) ("the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances"); *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999) ("Mere idiosyncracies of personal preference are not sufficient to state an injury"); *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1448 (11th Cir.1998) (finding "no case, in [the 11th] or any other circuit, in which a court explicitly relied on the subjective preferences of a plaintiff to hold that plaintiff had suffered an adverse employment action"); *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996) ("not everything that makes an employee unhappy is an actionable adverse action"); *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir.1994) (a "bruised ego" is not enough). As the Seventh Circuit has stated:

> Obviously a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already

> staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial.

*Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) (cited with approval in *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 641 (2d Cir.2000)). If ever there was a case of a "chip-on-the-shoulder" plaintiff, this is it.

To be adverse, an employment action must involve the deprivation of "some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment.'" *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (quoting *Karibian v. Columbia Univ.,* 14 F.3d 773, 778 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994)). Adverse employment actions are considered material if they are "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Torres v. Pisano,* 116 F.3d 625, 632 (2d Cir.), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

Here, plaintiff has failed to present any evidence, aside from his own personal preferences, showing that any of his transfers or reassignments could be considered adverse under these standards. While I recognize that a transfer may constitute an adverse action under some circumstances, such as where it "results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," *Galabya,* 202 F.3d at 641, no such circumstances exist here. Plaintiff asserts that his displacement from Franklin caused him to lose a number of committee posts, such as memberships on Franklin's School–Based Planning Team, the Technology Committee, and the Building Committee, and his position as yearbook advisor, but these were simply ancillary to his employment at Franklin. Plaintiff's "loss" of those positions was merely an inevitable

consequence of his reassignment. It is a given that if an employee is transferred from one place of employment to another, those responsibilities that are inherently and inextricably tied to the former place of employment cannot be transferred with him. It is unremarkable, for example, that plaintiff was no longer the yearbook advisor at Franklin after he was transferred elsewhere. That does not mean that he suffered some loss amounting to an adverse action; it was, instead, simply a necessary corollary of his transfer.

Although plaintiff claims that his removal from Franklin "has been devastating to [him] and [his] career," Plaintiff's Aff. ¶ 125, he has not presented facts to support that assertion, or to rebut the District's contention that plaintiff's transfers did not result in any change in his job description, days or hours of employment, duties, salary or benefits, or opportunities for promotion. Evangelista Aff. ¶¶ 59–60. Plaintiff may have been *subjectively* "devastat[ed]" by his transfer, but as explained, that is not sufficient to state a claim. "[T]he plaintiff must show that the transfer created a 'materially significant disadvantage.'" *Id.* (quoting *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994)). Plaintiff has failed to do so.

█ There *is* one action taken toward plaintiff that could be considered adverse: he was suspended, with pay, on October 1, 1998, and did not teach for the rest of that academic year. The suspension occurred after Jefferson's then-Acting Principal Larry Ellison reported to the RCSD's human resources department that plaintiff had made certain comments to him, including "I hate middle school students" and "they know I am going to hurt a kid," and that plaintiff had improperly sent several

special education students out of his classroom, allowing them to roam the halls freely. Ellison Aff. (Docket # 200) ¶¶ 11, 23–27. Although plaintiff was informed that he was being suspended pending an investigation, *see* RCSD's Ex. 9, it appears that no further action was taken other than to find an alternative placement for plaintiff. Affidavit of Alessio Evangelista (Docket # 198) ¶ 74. Plaintiff continued to receive full pay and benefits throughout this period.[11]

That claim, however, is time-barred. Under Title VII, a claimant must file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days after the alleged discriminatory event. 42 U.S.C. §§ 2000e–5(e). When a plaintiff has not done so, the claim is time-barred. *Butts v. City of New York Dept. of Housing,* 990 F.2d 1397, 1401 (2d Cir.1993). "This statutory requirement is rigorously enforced and bars untimely claims of discrimination." *Talyansky v. Mercury Print Productions, Inc.,* 25 F.Supp.2d 151, 153 (W.D.N.Y.1998), *aff'd,* 199 F.3d 1323 (2d Cir.1999), *cert. denied,* 528 U.S. 1118, 120 S.Ct. 939, 145 L.Ed.2d 817 (2000).

█ In the case at bar, plaintiff filed a charge with the EEOC on October 18, 1999. *See* RCSD's Ex. 63. Therefore, plaintiff's claims for acts that occurred prior to December 22, 1998, *i.e.* more than 300 days before October 18, 1999, are time-barred. Since plaintiff's suspension occurred in October 1998, it is time-barred. *See National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2072, 153 L.Ed.2d 106 (2002) (discrete discriminatory acts are not actionable if they occurred outside of the time when a plaintiff files his EEOC charge, even if the acts are related to acts alleged

---

11. There is evidence that plaintiff eventually made good on his alleged threat to "hurt a kid." *See infra,* pp. 23–24.

in timely filed charges); *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, (2d Cir.2003) (applying *Morgan* to find that employer's rejection of employee's proposed accommodation of his religious practices consisted of discrete acts rather than a continuing violation, and claim arising out of that rejection was therefore untimely).[12]

■ In addition to these defects, none of the circumstances surrounding plaintiff's transfers, his suspension, or any other actions taken by defendants toward plaintiff, suggest that they were motivated by race discrimination. For instance, in the Spring of 1998, at which time plaintiff was teaching at Franklin, the District decided to reduce the number of teaching positions at Franklin. This transfer appears to have been the principal action that led to this lawsuit. Defendants contend that this decision was motivated by declining student enrollment and budgetary constraints. In a memorandum dated May 11, 1998, Maurice Bell, RCSD's Supervising Director of Education, informed Franklin Principal Clark Powell that based on a projected enrollment of 957 students for the coming academic year, and the student-teacher ratio of 22.15:1 that had been approved in the budget process, Franklin was being assigned 43.2 full-time equivalent ("FTE") regular teachers for the coming year. RCSD's Exhibits (Docket # 206), Ex. 34. The previous year, utilizing almost the same student-teacher ratio, but with a projected enrollment of 1165 students, Franklin had been assigned 52.6 FTE teachers. RCSD's Ex. 33.

Powell was thus forced to eliminate a number of teaching positions at Franklin. In doing so, he decided to reduce the number of teachers in several tenure areas, including English, foreign languages, math, social studies, science and technology. Powell Aff. (Docket # 199), ¶ 16. Powell states in his affidavit that based on a number of considerations, he decided to displace two of Franklin's three technology teachers. The two teachers chosen to be displaced were Thomas DeMond, a black male born in 1950, and plaintiff, who, as stated, was born in 1956. The sole remaining technology teacher was Robert Kowalski, a white male born in 1945, who was also the most senior technology teacher, having been hired in 1970. DeMond, who was hired in 1991, had the least seniority among the three technology teachers, followed by plaintiff, who was hired in 1984. Defendants contend, and plaintiff has presented no evidence to the contrary, that since 1998, there has been only one technology teacher at Franklin, so plaintiff was never "replaced" there by anyone.

In response, plaintiff alleges that the RCSD defendants' proffered reason for plaintiff's displacement from his technology position-declining Franklin enrollment-is proven false by two documents: a March 9, 1998 memorandum from Bell to then-Superintendent Clifford Janey, and a document entitled "Position Control Template" ("template") for Franklin that appears to have been prepared for, or used at, an RCSD meeting on May 27, 1998 to discuss middle- and secondary-school staff-

---

**12.** I recognize that under *Morgan,* where the plaintiff alleges a hostile work environment claim, the court may consider acts falling outside the 300–day period as long as they are part of the same hostile work environment practice. 122 S.Ct. at 2076. I do not believe that plaintiff's suspension can reasonably be viewed as forming part of his hostile work environment claim, which I find to be merit-

less in any event. *See Alfano v. Costello,* 294 F.3d 365, 381 (2d Cir.2002) (Title VII claim by female corrections officer alleging that unwarranted investigation, notice of discipline, and suspension constituted unlawful sex discrimination, which was not raised in plaintiff's EEOC charge, was not reasonably related to hostile work environment claim that was raised in charge).

ing for the coming academic year. Plaintiff's Exs. 38, 39. The March 9 memo states in part, "As per your request, please find the staffing pattern, by position title, of Franklin High School from the 1993–94 school year through the current school year." The attached chart indicates a total enrollment at Franklin of 1179 (957 "regular" and 222 special education students) for 1997–98. Plaintiff's Ex. 38.

The May 27, 1998 template states, in part, that enrollment at Franklin for 1998–99 was projected to total 1268 (957 regular and 311 special education students). Plaintiff's Ex. 39. Thus, plaintiff argues, enrollment at Franklin was expected to increase, not decrease, in 1998–99.

Although defendants contend that the numbers contained in Bell's March 9 memo to Janey were erroneous [13], whether they were or not is really beside the point, because it is beyond dispute that Bell did tell *Powell*-the person who made the decision to displace plaintiff (as well as DeMond and other teachers)-that Franklin's enrollment was projected to decrease in the Fall of 1998, and that the number of FTE teachers allocated to Franklin would drop from 52.6 to 43.2, based on the same student-to-teacher ratio as the year before. Thus, as far as Powell was concerned, staffing cuts had to be made. Regardless of precisely how many students actually did attend Franklin during this period, then, it is clear that Powell was forced to, and did, reduce his staffing by displacing a number of teachers, including plaintiff.

Furthermore, regardless of whether enrollment at Franklin was expected to go up, down, or stay the same, plaintiff's discrimination claims must fail for one simple reason: there is *no* evidence of discriminatory animus on the part of any of the defendants.[14]

---

**13.** Bell testified at his deposition that the chart attached to his March 9 memo indicated "that the enrollment at Franklin from one year to the next is higher, but that is in error." Bell Depo. Tr. (RCSD's Ex. 96) at 225. He stated that he realized the error when he reviewed "[t]he original staffing letters that went to buildings, including Franklin." *Id.* at 226. Presumably Bell was referring to the letters that he sent to Principal Powell in May 1997 and 1998 concerning staffing for the upcoming years.

Although, as stated, it is ultimately inconsequential which numbers were the correct ones, the evidence does indicate that the March 9 memo was erroneous, or at least inconsistent with all the data concerning enrollment projections for Franklin. Whereas the May 1998 template, indicates that Franklin's 1998–99 enrollment was projected to total 1268, the template that was prepared for the 1997–98 academic year shows a projection of 1165 students in grades 9 through 12, and an additional 225 in special education, for a total of 1390. RCSD's Ex. 97. Thus, a comparison of the two templates from 1997 and 1998 does show that enrollment at Franklin was expected to decrease in the Fall of 1998.

The figures in the templates are also consistent with those contained in the May 1997 and 1998 memos from Bell to Powell concerning staffing for the upcoming academic years. The May 7, 1997 memo states that Franklin's 1997–98 enrollment was projected to be 1165, and the 1998 memo gives a projected enrollment of 957 regular students for 1998–99. Those are the same numbers given for projected enrollment in grades 9 through 12 in the templates. This evidence thus indicates that enrollment was *projected* to decrease, and it was based on those projections that the decision was made to cut the number of teachers at Franklin for the 1998–99 year.

**14.** I am aware that in *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 134, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court held that "because the factfinder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." The Court hastened to add, however, that "[c]ertainly there will be instances where, although the plaintiff has

As stated, when Powell decided to displace two technology teachers, the two that he chose were plaintiff and DeMond, who is black. The sole remaining technology teacher was Kowalski, who is white, and the oldest of the three. It is simply incomprehensible how Powell could have been motivated by bias against whites or older employees[15] in making these decisions, in the face of this evidence.[16]

■ After learning that he was being displaced from his technology position at Franklin, plaintiff sought to be assigned to either the In–School Suspension Room or the Tardy Room. Defendants contend that plaintiff was overqualified for the Tardy Room position, which was held by a papa-professional during the 1998–99 school year. Affidavit of Alessio Evangelista (Docket # 198) ¶ 44.

Plaintiff was qualified for the In–School Suspension Room position, but there is no basis on which to conclude that he was *entitled* to that position. Ultimately Principal Powell assigned Gregory Wilkes, a white male math teacher born in 1962, to the position. Powell Aff. ¶ 42. Powell states that he preferred Wilkes over plaintiff because Wilkes, as an experienced math teacher, would be available to teach math, and because, in Powell's estimation, Wilkes's personality made him better suited for the In–School Suspension Room position, which . required someone who could get along well with students, parents, administrators, and other teachers. Powell Aff. ¶¶ 42, 43.

Plaintiff again claims that discrimination was the reason he was not selected for this position, but this claim is as defective as

established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational factfinder could conclude that discrimination had occurred." *Id.* at 134–35, 120 S.Ct. 2097.

Under *Reeves*, then, "once a minimal prima facie case is proved and the employer's non-discriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n,* 233 F.3d 149, 156 (2d Cir.2000); *see also Schnabel v. Abramson,* 232 F.3d 83 (2d Cir. 2000) (*Reeves* "mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff' ") (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). For the reasons stated herein, even if a factfinder could conclude that defendants' assertions about declining enrollment at Franklin are false, I do not believe that the factfinder could reasonably conclude that discrimination was the real reason for plaintiff's transfer. *See James,* 233 F.3d at 157 (stating that *Reeves* impliedly rejects the ... proposi-

tion ... that evidence satisfying *McDonnell Douglas's* minimal requirements of a prima facie case plus evidence from which a factfinder could find that the employer's explanation was false necessarily requires submission to the jury).

15. At his deposition, plaintiff testified that he had on occasion heard Powell refer to older persons as "old farts" and the like. *See* Defendants' Ex. 75. Since there is no evidence that Powell discriminated against plaintiff on account of his age, however, and since these stray remarks were not related to the decisions affecting plaintiff, they are not probative of plaintiff's claim of age discrimination. *See Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994).

16. Defendants also contend, and plaintiff has presented no evidence to the contrary, that the Powell's displacement decisions had a negligible effect on the ratio of white to minority teachers at Franklin. Before the displacements, 73.5 percent of the teacher at Franklin were white, and 26.5 percent were black or Hispanic. After the displacements, 27.2 percent of the teachers were black or Hispanic-an increase of only 0.7 percent. Affidavit of Alessio Evangelista (Docket # 198) ¶ 50. Thus, there is no indication that Powell

plaintiff's claim regarding his displacement. Although plaintiff broadly asserts that he had a right or entitlement to various positions, the evidence does not support that conclusory assertion. For instance, plaintiff states at page 14 of his memorandum of law that he "was entitled to the In School Suspension Room and/or Tardy Room jobs at [Franklin] in the 98/99 school year pursuant to the RCSD/RTA contract, RCSD policy and practice and/or applicable arbitration decision . . .,"[17] but he fails to explain specifically what it was that "entitled" him to those positions, nor has he rebutted defendants' contention that these jobs were typically filled by nontenured teachers or paraprofessionals. He also fails to explain how the selection of a white male to the In–School Suspension Room position evinces discrimination toward plaintiff.

Plaintiff does cite two exhibits in support of his assertion that he was entitled to these jobs, but they do not show that he was. The first is an arbitration decision involving a different individual, under different circumstances from plaintiff, and is based on an entirely different set of facts. Plaintiff's Ex. 48. The second is an October 5, 1998 letter from plaintiff to the supervising director of the District's Human Resources Department, requesting that plaintiff be transferred from Jefferson, because plaintiff alleged that he had been assaulted there the week before. Plaintiff's Ex. 56.

How either of these documents is supposed to show that plaintiff was entitled to the In–School Suspension Room or Tardy Room position is not apparent. Unfortunately, however, this is typical of plaintiff's assertions and arguments, most of which consist of a broad allegation of wrongdoing by defendants, followed by a citation to an array of documents, often of dubious relevance to plaintiff's arguments, with no explanation of how those documents support plaintiff's assertions.

In any event, as with his claim concerning the technology position, plaintiff has failed to present any evidence that unlawful discrimination had anything to do with these matters. While plaintiff spends considerable time discussing why he believes he should have been given certain jobs, notably absent from his papers is why his race, age, sex, etc. were in any way connected with these events.

■ The same is true of plaintiff's claim concerning his suspension. While plaintiff denies that he ever threatened to hurt a student[18], there is no dispute that Principal Ellison reported to the District's human resources department that Murphy had made such statements, and it was certainly appropriate under the circumstances to suspend plaintiff pending an investigation. There is not a shred of evidence that plaintiff's race, age or sex played any part in the decision to suspend him.

used the staff reduction process as a vehicle to purge white teachers from Franklin.

17. Plaintiff's repeated use of the term "and/or" (as in his mantra-like assertion that he has been discriminated against on account of his "race, and/or sex, and/or age, and/or national origin, and/or disability") exemplifies his inability, or refusal, to make concrete, focused arguments supported by specific facts.

18. Regardless of whether plaintiff did make these statements, it was still appropriate to suspend him, given Ellison's report. I note, however, that in her deposition testimony, defendant Martha Keating (an RTA vice president) corroborated Ellison's allegations. She stated that during a telephone conversation with Murphy, he "told [Keating] that he had said to Mr. Ellison something to the effect that, 'he hoped he would not have to hurt any students.'" RCSD's Ex. 278.

The record shows, in fact, that defendants have at times displayed remarkable forbearance in dealing with plaintiff. There is evidence, for instance, that plaintiff physically assaulted one of his students, yet he was apparently not punished. Wilhelmina Glover, the principal at Thomas while plaintiff taught there, states that on October 13, 1999, several students reported to the vice principal that Murphy had shoved a sixth-grade female student in his class. When Glover went to plaintiff's room to talk to him about this incident, Murphy immediately (and conveniently) complained of difficulty breathing, and went to the nurse's office. A short time later he was wheelchaired out of the building, and did not return that day.

Glover states that afterwards, she spoke to plaintiff's students about the incident, and asked them to prepare written statements about what they had witnessed, as well as their general comments about Murphy's class. One student wrote, "Mr. Murupy [sic] Ihad [sic] push me I went to open the door and he push real hard." Some students who had witnessed the incident wrote that: a student "was dancing around because she had to use the bathroom so [Murphy] shuffed [sic] her into the hallway and Mr. Murpy [sic] said that he don't care if she use the bathroom on herself"; Murphy "grade [sic] [the student who had to use the bathroom] by her arm and shoved her in the room"; "The teacher went to the door and put me and 2 other girls out. When he was puting [sic] us out he hit one girl"; and Murphy "grabbed [the student] by her arm, and pushed . . . ." RCSD's Ex. 56.[19]

Had defendants been looking for an excuse to take action against plaintiff, this certainly presented them with an opportunity to do so. It appears, however, that plaintiff was not disciplined. He left Thomas about a week after this incident, complaining of illness, spent most of the rest of that school year on sick leave (at full pay), and returned to teach at Franklin in September 2000. This hardly suggests that defendants sought to discriminate against plaintiff.

In short, plaintiff has essentially taken a simple employment dispute and attempted to shoehorn it into the framework of the antidiscrimination laws. Plaintiff may be unhappy with his assignments during his employment with the RCSD, but for his claims in this action to survive, there must be some evidence of unlawful discrimination. There is none. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir.2001) ("Plaintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race. This is not sufficient").

### B. Plaintiff's Hostile Work Environment Claim

Plaintiff also attempts to assert a claim of discrimination based on the theory that defendants have maintained a hostile work environment for plaintiff and other teachers based on their race "and/or" sex. This claim must also be dismissed.

■■■ In order to prevail on a claim that sexual harassment has caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements. First, the plaintiff must show that his workplace was permeated with "discriminatory intimidation, ridicule, and insult . . . that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

**19.** Other comments included numerous complaints about the classroom being cold because plaintiff insisted on keeping the windows open; statements that the students could not understand plaintiff when he spoke because he was wearing a mask; several statements that "nothing is going well" in the class; and "He teaches us nothing."

working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). The plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted). Second, the plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003); *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002); *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997). The key, of course, is that the acts must relate to some discriminatory activity.

In *Harris,* the Supreme Court set forth a non-exhaustive list of factors relevant to determining whether a given workplace is permeated with discrimination so "severe or pervasive" as to support a Title VII claim. These include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the plaintiff. 510 U.S. at 23, 114 S.Ct. 367.

The Second Circuit has instructed that the court should consider the totality of the circumstances in determining whether a plaintiff has submitted evidence sufficient to support a finding that a hostile work environment relating to discrimination existed. *See Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997) (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367), and to evaluate the "quantity, frequency, and severity" of the incidents, *see id.* (citing *Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1164 (7th Cir.1994)). The factors must be considered "cumulatively," so that the court can "obtain a realistic view of the work environment." *Id.* (quoting *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 444 (7th Cir.1994)).

The requirements for a hostile work environment claim based on the plaintiff's race are similar. "The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace." *Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998). It is axiomatic that a plaintiff "must produce evidence that [ ]he was discriminated against because of [his] race." *Richardson,* 180 F.3d at 440; *see, e.g., Narvarte v. Chase Manhattan Bank, N.A.,* 2000 WL 547031, at *10 (S.D.N.Y. May 4, 2000) (claims of overzealous monitoring of plaintiff's arrival times and negative performance evaluations do not demonstrate discrimination on account of race.); *Murray–Dahnir v. Loews Corp.,* 1999 WL 639699, at *4 (S.D.N.Y. Aug. 23, 1999) (claims that plaintiff was forced to work longer hours without adequate staff support and that supervisor "ceased direct communications" and reprimanded plaintiff " 'publicly and unjustifiably' on 'numerous occasions' " failed to establish a hostile work environment claim).

In assessing such claims, the court must also be mindful that "Title VII is not a 'general civility code.' " *Bickerstaff v. Vassar College,* 196 F.3d 435, 452 (2d Cir.1999) (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)), *cert denied,* 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). While Title VII "protects employees from improper discriminatory intimidation[,] it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervi-

sors." *Curtis v. Airborne Freight Corp.*, 87 F.Supp.2d 234, 250 (S.D.N.Y.2000).

■ Plaintiff has completely failed to make out a hostile work environment claim under these standards. Difficult or stressful working conditions are not tantamount to a "hostile" work environment caused by acts of discrimination. While his allegations about conditions in his workplace indicate that his working conditions were not always pleasant, there is simply no evidence that race or sex discrimination was a factor. Plaintiff's chief complaint seems to be that he and other teachers were subjected to the danger of student violence, but there is no evidence that white or male teachers were particularly at risk in that regard, nor is there any evidence to support plaintiff's conclusory allegation that the District turned a blind eye to violence only when it was perpetrated against white teachers. *See Bliss*, 196 F.Supp.2d at 325 (stating that plaintiff teacher who alleged that she had been assaulted by student "has failed to set forth sufficient evidence that discrimination against Caucasians was more than likely the reason for the district's alleged failure to act concerning these student-teacher problems"); *Seils*, 192 F.Supp.2d at 118 (stating that plaintiff "has simply not shown that any of the actions perpetrated by her students or their parents occurred because [she] was Caucasian," and agreeing with RCSD that plaintiff "was treated the way she was because [she] was a teacher, and not because she was of any particular ethnic background").

Plaintiff also asserts, in what amounts to a diatribe against defendant Powell, a series of allegations that range from the merely silly (such as the allegation that Powell "insisted that [Franklin] have a 'Gospel Choir,'" which was run by "black staff with no musical training," Plaintiff's Aff. ¶ 408) to the scurrilous and arguably defamatory. Plaintiff alleges, *inter alia*, that: he has heard Powell use vulgar and abusive language, including the words "fuck," "nigger," and "bitch," directed toward teachers, administrators and students, including black women, Plaintiff's Aff. ¶ 407; plaintiff has observed Powell reeking of alcohol and "falling down drunk" at school, Plaintiff's Aff. ¶ 409; plaintiff has heard students refer to Powell as a "crackhead," meaning someone who uses crack cocaine, Plaintiff's Aff. ¶ 418; Powell often walked around the school with his pants fly open, Plaintiff's Aff. ¶ 420–22; and Powell "was investigated as a suspect in a series of rapes of elementary age school children in the vicinity of Franklin High School," and the police sketch of the rapist so closely resembled Powell that "someone" circulated a flyer through the school juxtaposing the police sketch with a photograph of Powell, a copy of which plaintiff has submitted. Plaintiff's Aff. ¶¶ 425, 426; Plaintiff's Ex. 166.

■ The only thing that these allegations make clear is that plaintiff completely misapprehends the nature of a hostile work environment claim. Hostile work environment claims are merely a subset of disparate treatment claims. *See Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir.2001) ("Disparate treatment prohibited by Title VII also encompasses sexual harassment that results in a hostile or abusive work environment") (internal quote omitted), *cert. denied*, 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002). Therefore, in order to establish such a claim, the plaintiff must show not only that his work environment was intolerable, but also that it was *discriminatory*. *See Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir.2000) (plaintiff alleging hostile work environment must "show that the workplace is permeated with 'discriminatory intimidation, ridicule, and insult ...'")

(quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367).

Assuming the truth of plaintiff's allegations (and leaving aside the fact that many of them, such as students' hearsay comments about Powell, would be inadmissible at trial, and hence are not competent material for a Rule 56 affidavit, *see Howley,* 217 F.3d at 155), all that plaintiff has shown here is that some RCSD schools are, at times at least, very difficult and challenging places to work. There is *no* evidence that white or male teachers were singled out for harassment, however, and in fact some of plaintiff's own evidence, such as Powell's alleged use of vulgar language directed at, or referring to, black females, suggests precisely the opposite.

█ I recognize that in order for a hostile work environment to exist, "offensive remarks or behavior [need not] be directed at individuals who are members of the plaintiff's own protected class." *Cruz,* 202 F.3d at 570. However, Powell's alleged use of the words "nigger" and "bitch" directed at black and female employees do not give rise to an issue of fact about whether plaintiff was subjected to a hostile work environment. For one thing, *Cruz* and other cases that have expressed or applied that principle typically involve plaintiffs who are members of *one* minority alleging remarks or behavior directed toward members of *other* minorities. *See, e.g., id.* ("Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee"); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 66, 70 n. 9 (2d Cir.2000) (African–American plaintiffs; supervisor had "delivered a veritable barrage of racial epithets" directed at blacks, Puerto Ricans, and Mexicans); *Schwapp v. Town of Avon,* 118 F.3d 106, 111–12 (2d Cir.1997) (finding that harassment of other minorities was relevant to whether a black police officer experienced a racially hostile or abusive working environment). The rationale behind this rule has far less application, however, when a non-minority plaintiff alleges that his supervisor has directed hostility toward minority employees. An African–American employee, for example, might well feel threatened by a supervisor's expressed hostility toward Hispanics; it would not be unreasonable to assume that the supervisor might be prejudiced against other minorities as well. But it is difficult to see why a white employee would feel similarly threatened when his African–American supervisor directs racial epithets at other blacks.

In *Sidari v. Orleans County,* No. 95–CV–7250, 2000 WL 33407343 (W.D.N.Y. Oct. 3, 2000), the court did hold that an Italian–American corrections officer who claimed that he had been discriminated against on account of his national origin could introduce evidence that the defendants had discriminated against African–American and Hispanic jail inmates. The court based its decision, however, on plaintiff's allegations that one defendant had: referred to plaintiff as "a nigger turned inside out"; stated that "there was no difference between blacks and Italians," that "Italians are niggers," and "they are the same thing"; and otherwise equated Italians in general, and plaintiff in particular, with blacks. Based on these allegations, the court found that "the evidence of racial discrimination against jail inmates is in fact related and relevant to the discrimination that plaintiff Paul Sidari alleges he experienced, and that such racial discrimination could reasonably have affected plaintiff's working environment." 2000 WL 33407343, at *4. In contrast, in the case at bar, there is nothing that would tend to link Powell's alleged vulgarities referring to women and blacks to prejudice against men or whites.

At most, plaintiff's evidence about Powell's behavior simply suggests that he was abusive toward, and probably disliked by, many of the people around him, but not because of his or their race, sex, or other legally protected characteristics. Viewed in context of all the evidence, Powell's alleged use of certain vulgarities or expletives adds to plaintiff's portrayal of Powell as a foulmouthed, ill-tempered person, but it does not show that plaintiff was subjected to a hostile work environment for purposes of his discrimination claims.

### III. Plaintiff's Disability Discrimination Claims

■ The Second Circuit analyzes claims of intentional discrimination under the ADA and the Rehabilitation Act[20] using the *McDonnell Douglas* burden-shifting analysis. *See Regional Economic Community Action Program, Inc. v. City of Middletown ("RECAP")*, 294 F.3d 35, 48–49 (2d Cir.) ("We analyze claims of intentional discrimination under the ... ADA ... and the Rehabilitation Act under the familiar *McDonnell Douglas Corp. v. Green* burden-shifting analysis established for employment discrimination cases under Title VII ..."), *cert. denied*, 537 U.S. 813, 123 S.Ct. 74, 154 L.Ed.2d 16 (2002). Thus, the initial burden is on plaintiff to state a prima facie case. *Id.*

■ To state a prima facie case of employment discrimination under the ADA, a plaintiff must show: (1) that he is an individual with a disability within the meaning of the statute; (2) that his employer is subject to the ADA and had notice of the disability; (3) that the plaintiff was otherwise qualified to perform the essential functions of his position, with or

without reasonable accommodation; and (4) that he was fired or suffered adverse employment action because of the disability. *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir.1999); *Reeves v. Johnson Controls World Serv.*, 140 F.3d 144, 149–50 (2d Cir. 1998); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998).

■ The elements of a Rehabilitation Act claim are "identical," *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir.1999), *cert. denied*, 531 U.S. 864, 121 S.Ct. 156, 148 L.Ed.2d 104 (2000), except that under the Rehabilitation Act, the defendant must have discriminated against the plaintiff "solely" because of the plaintiff's disability, whereas under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination. *RECAP*, 294 F.3d at 48–49; *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir.2000); *First Step, Inc. v. City of New London*, 247 F.Supp.2d 135, 150 (D.Conn.2003); *see also Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994) (setting forth elements of prima facie case under Rehabilitation Act), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

■ The first thing plaintiff must show, then, is that he is disabled. *See Chille v. United Airlines*, 192 F.Supp.2d 27, 29 (W.D.N.Y.2001) ("To state a claim under the ADA, it is elemental that plaintiff must allege that she suffers from a 'disability' as defined by the Act"). The ADA defines "disability" as: "a physical or mental impairment that substantially limits one or more of the major life activities

---

**20.** Although the complaint also alleges a claim for disability discrimination under Title VII, "[c]laims of disability and age discrimination are not cognizable under Title VII." *Lyon v. Jones*, 260 F.Supp.2d 507, 513–14 n. 1 (D.Conn.2003). *See* 42 U.S.C. § 2003e–2 (prohibiting employment discrimination based on an individual's "race, color, religion, sex, or national origin").

of such individual"; "a record of such an impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(2).[21]

Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). An activity is "substantially limited" when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual can ... perform [the] activity." 29 C.F.R. § 1630.2(j)(i)-(ii).

In the case at bar, plaintiff's alleged disability is his asthma. His motion papers, however, do not attempt to address the particular requirements of the ADA, and instead argue simply in general terms that plaintiff is disabled as a result of his asthma. Plaintiff does not, for example, discuss whether asthma is a "physical impairment" for purposes of the ADA, or, if so, whether it substantially limits any of his major life activities.

■ Defendants do not appear to dispute that plaintiff does have asthma, and it is clear that asthma constitutes a physical impairment. Regulations promulgated by the Equal Employment Opportunity Commission define physical or mental impairment as, *inter alia*, "any physiological disorder or condition ... affecting [the] ... respiratory [system]." 29 C.F.R. § 1630.2(h)(1). "Asthma is a physiological disorder or condition that affects the respiratory system," and hence is a physical impairment. *Heilweil*, 32 F.3d at 723.

■ Plaintiff must therefore show that this impairment "substantially limits one or more of [his] major life activities." As stated, plaintiff has not said what particular life activities he alleges are substantially limited due to his asthma, but based on plaintiff's factual allegations, it appears that he claims that his asthma substantially limits his ability to breathe and to work. While the determination of whether an individual is disabled must be should be made on a case-by-case basis, *see Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), "[m]any courts addressing the issue ... have found that asthma does not substantially limit the particular plaintiff's ability to work or breathe and therefore does not·constitute a disability under the ADA or Rehabilitation Act." *Castro v. Local 1199, Nat'l Health and Human Servs. Employees Union*, 964 F.Supp. 719, 724 (S.D.N.Y.1997) (collecting cases); *see also Nugent v. Rogosin Inst.*, 105 F.Supp.2d 106, 113 (E.D.N.Y.2000) ("[n]umerous other courts have ... held that an asthmatic condition which only prevents plaintiff from working at one job, or a narrow category of jobs, is not a qualifying disability under the ADA or the Rehabilitation Act"; collecting cases).

■ I must also keep in mind that the Supreme Court has instructed courts that in determining whether plaintiff is disabled, any "measures that mitigate the individual's impairment" must be taken into account. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In other words, the court should consider the extent to which plaintiff is able to control his asthmatic symptoms. *See, e.g., Muller v. Costello*, 187 F.3d 298, 313 (2d Cir.1999) (stating that court "must evaluate Muller's disability [asthma] with reference to the applicable corrective measures, in this case, his

---

**21.** Since the requirements of the ADA and Rehabilitation Act are identical in this regard, they will be considered in tandem, and for the sake of convenience, "ADA" will be understood to refer to both statutes unless otherwise noted. *See Rodriguez*, 197 F.3d at 618.

inhalers and other medications," that "the jury was precluded from speculating about how severe Muller's asthma would be but for his medications," and holding that evidence did not support finding of disability); *see also Bobrowsky v. New York City Bd. of Educ.*, No. 97CV874, 1999 WL 737919, at *4 n. 2 (E.D.N.Y. Sept. 16, 1999) (observing that following the Supreme Court's decision in *Sutton*, "a plaintiff with treatable asthma may not qualify as 'disabled' within the meaning of the ADA," but finding it unnecessary to decide the issue), *aff'd*, 213 F.3d 625 (2d Cir.2000).

Even prior to *Sutton*, the Second Circuit found that a plaintiff who suffered from asthma was not disabled in *Heilweil*, 32 F.3d 718. In that case, the plaintiff, who had been diagnosed as an asthmatic, was hired by a hospital to work as a manager. When she was transferred to the hospital's blood bank, the plaintiff's asthma symptoms worsened, and her physician told her that the air quality at the blood bank was the principal cause of her ailments and advised her to stay away from it. After discussing the matter, the plaintiff and her supervisor agreed that the plaintiff would continue to perform her blood bank duties until her supervisor could find a replacement for her, after which the plaintiff would be given time to find new employment, either at the hospital or elsewhere. For the next several months, she never entered the blood bank, and administered it from the outside. The plaintiff stated that her health rapidly improved, and she attributed the improvement to the change in her work routine. When the plaintiff refused to meet with the new medical director at the blood bank, however, the hospital demoted and then terminated her. The plaintiff then filed an action against the hospital under the Rehabilitation Act. *Id.* at 720–21.

The Court of Appeals affirmed the district court's finding that the plaintiff was not a handicapped person within the meaning of the Rehabilitation Act. *Id.* at 721. The court reasoned that because the plaintiff's respiratory problems were exacerbated only when she worked in the blood bank, her medical condition did not substantially limit one or more of her life activities. In particular, the court, noting that the plaintiff stated that she felt "fine, now" because she had not been in the blood bank for several months, *id.* at 723, held that the plaintiff's asthma did not significantly affect the plaintiff's ability to breathe. *Id.* Stating that "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one," *id.*, the court also held that the plaintiff's ability to work was not substantially limited, because the "plaintiff was medically restricted from working in only one place in the hospital-the blood bank." *Id.* at 724. The court stated that "a person found unsuitable for a particular position has not thereby demonstrated an impairment substantially limiting such person's major life activity of working." *Id.* at 723.

Summarizing its holding, the Court of Appeals stated that

> the inability to satisfy the requirements of a particular assignment does not mean such a person is regarded as handicapped. Such inability does not constitute the necessary substantial limitation of a "major life activity" required to meet the definition of a handicapped person under the Act. To meet that definition, the employee's impairment must limit her employment generally.

*Id.* at 719.

Similarly, in *Castro*, an ADA case, the district court, relying on *Heilweil*, stated that "plaintiff must show that her asthma substantially limits her ability to breathe, which has the overall effect of restricting her employment opportunities generally.

Plaintiff has not met this burden." 964 F.Supp. at 725. The court noted that the plaintiff had stated that her asthma restricted only her ability to go outside in extreme temperatures, and that either extreme humidity, extreme cold, or strong winds could trigger an asthma attack. For the bulk of her time, however, the plaintiff was not required to work in extreme temperatures and, if the occasion required that she do so, she was able to manage. *Id.* The court concluded that the

> plaintiff's physical impairment did not substantially limit her ability to breathe, and similarly, her asthma did not limit her employment opportunities generally; rather, it only restricted plaintiff's work capabilities in the narrowest sense. Far from being inhibited in her ability to work generally, plaintiff's difficulties arose only in regard to a single aspect of a single position. Courts have held that such a minimal limitation does not rise to the level of a disability under the ADA.

*Id.* Accordingly, the court granted summary judgment for the defendants on plaintiff's ADA claim.

▆▆▆ Again, I recognize that there is no per se rule that asthma can never be disabling, and that this issue must be determined on a case-by-case basis. Nevertheless, it is clear from these cases that where a person's asthma or similar condition does not substantially limit his ability to breathe, or where it prevents the person from working at only one job, or a narrow category of jobs, that person is not "disabled" for purposes of the ADA. *See, e.g., Muller,* 187 F.3d at 313 (plaintiff who suffered from asthma, which made it difficult for him to breathe when exposed to cigarette smoke, was not disabled for purposes of ADA; although it was undisputed that plaintiff could not work as a corrections officer at the facility where he was stationed under prevailing conditions, "[t]he

position of correctional officer constitutes a single, particular job, and a limitation on a single, particular job cannot constitute a substantial limitation of the major life activity of working"); *Weiss v. City of New York,* No. 96CIV8281, 2003 WL 1621403, at *4 (S.D.N.Y. Mar. 28, 2003) ("Plaintiff has not demonstrated that his breathing problems or asthma substantially limit his performance of major life activities," including working, because, "[e]ven if, as Plaintiff suggested, he cannot work full-time as an indoor mechanic, he has not demonstrated that he is precluded from 'more than a particular job' "); *Nugent,* 105 F.Supp.2d at 113 ("Nugent's asthma attacks, which were apparently triggered primarily by allergens present at RKC and only prevented her from working at RKC, cannot be found to substantially limit her ability to work or to breathe," since plaintiff was able to work elsewhere, and she "produced no evidence to show that her asthma significantly limited her ability to breathe outside the workplace"); *Bellom v. Neiman Marcus Group,* 975 F.Supp. 527, 533 (S.D.N.Y.1997) ("Because plaintiff has failed to adduce evidence addressing the issue of how her asthma affected activities beyond that of working in the cosmetics department at Neiman Marcus, she had not adduced competent evidence to create a triable issue on whether she is, in fact, 'disabled' within the meaning of the ADA").

Under this standard, it is evident that plaintiff is not disabled for purposes of the ADA. In plaintiff's December 10, 2001 affidavit in support of his motion for partial summary judgment, plaintiff states that his "doctor has diagnosed [plaintiff] with asthma induced by workplace exposure to dust, especially wood dust." Plaintiff's Aff. (Docket # 220), ¶ 462. Plaintiff states that he told a physician in 1999 that he "had numerous asthma attacks in the course of recent years, most notably when in buildings with recycled air and no fresh

air source, and had also suffered attacks in airplanes. [Plaintiff] reported that [he] *was able to control the attacks* and continue to function as long as [he] had an immediate source of fresh air." Plaintiff's Aff. (Docket # 256) ¶ 141 (emphasis added)

The opinions of the physicians who examined and treated plaintiff are consistent with plaintiff's own assertion that his asthma is controllable. For example, in 1999, at the District's request, plaintiff was interviewed and examined by Mark J. Utell, M.D., the director of the Pulmonary and Critical Care Unit of Strong Memorial Hospital in Rochester. He stated, *inter alia*, that: plaintiff's "respiratory symptoms have been generally well controlled when he is out of the school"; on those occasions when plaintiff began to experience symptoms (such as chest tightness) while in the school building, "his symptoms ... w[ould] improve if not entirely resolve" if plaintiff went outside "for a brief time"; plaintiff "never raised any complaints about entering other buildings" besides his school buildings; and given the results of two very comprehensive reviews of the indoor environment [of Jefferson and the Freddie Thomas Learning Center ("Thomas"), where plaintiff taught for a brief period in the Fall of 1999] which frankly failed to identify any specific sources of contamination, "it seems that [plaintiff] probably has tolerated much poorer ventilation than would be found at the Jefferson or Freddie Thomas Schools." RCSD's Ex. 22. Dr. Utell concluded that "there is a psychological component to [plaintiff's] illness" and that unless plaintiff were placed "in a location where he is convinced that the ventilation is adequate," Dr. Utell "d[id] not believe that [plaintiff] will be able to adequately function in the work site." *Id.*

Plaintiff was also seen by another physician, William Beckett, M.D., M.P.H., from Finger Lakes Occupational Health Services, in early 2000. In his new-patient summary dated February 23, 2000, Dr. Beckett stated that "[t]he accommodated work assignment to a classroom with computers would seem to be the appropriate accommodation for someone with asthma, and so far I have not found the cause for his continued difficulties." RCSD's Ex. 15.

In a report dated March 30, 2000, Dr. Beckett stated that "exposure to wood dust ... should continue to be avoided," and that "assignment in a classroom with computer terminals [as opposed to woodworking machines] and a window that can be opened ... does appear to be a reasonable accommodation for a teacher with asthma, to allow continued work while maintaining optimal control of his asthma." RCSD's Ex. 24. Dr. Beckett also stated that he "ha[d] not been able to identify any remediable factor in [plaintiff's] classroom that would reduce his asthma symptoms in this environment. In general, this seems like the correct environment for a person with difficult-to-control asthma or with occupational asthma." *Id.*

Plaintiff's own primary care physician, D.M. Dobrzynski, M.D., also indicated that plaintiff needed to work in a dust-free environment. In an unaddressed note dated June 8, 1998, Dr. Dobrzynski stated that plaintiff "has asthma. His work environment should be dust-free & without allergens." RCSD's Ex. 7. In a noted dated September 3, 1998, Dr. Dobrzynski similarly stated that plaintiff "has asthma and should be restricted from dusty environments." RCSD's Ex. 43.

Again, all this evidence points inescapably to the conclusion that plaintiff's asthma is controllable, and that it does not "substantially limit" his ability to work or to breathe. Plaintiff may *believe* that he is disabled, as evidenced by the lengths to which he has sometimes gone in order to "protect" himself from perceived contaminants. On one occasion, for example,

plaintiff arrived to teach at Franklin wearing a full, head-to-toe "hazmat" type suit. *See* RCSD's Ex. 31. Whether this stemmed from plaintiff's subjective belief that he needed to wear such a suit for the sake of his health, or whether this was merely an attempt to draw attention to his complaints, or to harass school officials, the medical evidence does not support plaintiff's assertion that he is disabled.

I also note that plaintiff now contends that his asthma is "global," meaning that it affects him everywhere, not just in the classroom. Plaintiff's attorney goes on to state in her reply brief that "[t]he federal courts have held that asthma is covered by the ADA when the asthma is 'global'— when the plaintiff can demonstrate that he is affected essentially in all places and/or in all jobs by the condition." Plaintiff's Reply Brief at 15. Plaintiff's counsel has not, however, seen fit to identify just which "federal courts" she is referring to, and this Court has been unable to locate a single case standing for that proposition. As I did in *Bliss,* 196 F.Supp.2d at 338, and in *Seils,* 192 F.Supp.2d at 123, 127 n. 18, I once again must remind counsel of the terms of Rule 11 of the Federal Rules of Civil Procedure, which provides that an attorney presenting a pleading to the court

> is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

Fed.R.Civ.P. 11(b)(2). By making an unsubstantiated, and apparently false, assertion about what "federal courts" have held, plaintiff's counsel appears to have ignored Rule 11 just as she has ignored other Rules.[22]

In any event, whether asthma or any other impairment-"global" or not-constitutes a disability for purposes of the ADA must be determined in accordance with the standards which I have already set forth. For the reasons stated, I find as a matter of law that plaintiff is not disabled under those standards.

■ Plaintiff also contends that the District is estopped from arguing that plaintiff is not disabled because of a decision issued by the New York State Workers' Compensation Board ("WCB") on October 29, 2001. In that decision, however, the WCB simply found that "[t]he claimant Donald F. Murphy has an occupational disease involving asthma,"[23] and awarded him $13,440 in disability benefits for a period of disability from October 21, 1999 to June 13, 2000, plus $3000 in attorney's fees. RCSD's Ex. 50. The WCB stated that it found "no evidence or insufficient evidence that the claimant has a permanent restriction or loss of use as a result of this injury," and said that if plaintiff believed that he had a permanent disability, he should obtain a written opinion as to permanency from his physician, and submit that opinion to the WCB along with a letter requesting further action by the WCB. *Id.* Plaintiff did submit a letter from his doctor dated November 26, 2001, stating that plaintiff "has clear-cut occupationally induced asthma" and that plaintiff's

---

**22.** Plaintiff's counsel is evidently aware of the terms of Rule 11, since she herself has quoted from it in her brief (although the relevance of Rule 11 to plaintiff's argument at that point in her brief-that the RCSD made no good-faith effort to comply with the parties' earlier set-

tlement agreement *after* it was entered into-is unclear). *See* Plaintiff's Brief at 5–6.

**23.** "Occupational disease" means "a disease resulting from the nature of employment and contracted therein." N.Y. Workers' Comp. L. § 2(15).

"asthma condition is permanent and was clearly exacerbated by his work environment at Franklin High School. Because of this he lost an extensive time period from work, despite maximal medical treatment." Plaintiff's Affidavit (Docket # 256), Ex. 35. It is not apparent whether any further action by the WCB was requested or taken.

What the WCB found, then, was that plaintiff had asthma resulting from, or contracted at, his employment. Plaintiff's physician also opined that the asthma is a permanent condition. All that these findings and opinions state, then, is that plaintiff has asthma that is related to his work environment. For purposes of the pending motion, though, the Court *assumes* that plaintiff does have asthma. These findings and opinions do not, however, address whether plaintiff is *disabled* within the meaning of the ADA, *i.e.*, whether plaintiff's asthma substantially limits his ability to breathe or to work generally.

Plaintiff also frequently contends that the District is "responsible" for his asthma; in other words, that the District's placement of plaintiff in dusty environments is what caused his asthma. This is not a workers' compensation case, however. Whether defendants' actions caused plaintiff to contract asthma is not the issue. The issue is whether they have discriminated against him on account of his actual or perceived disability, and there is no evidence that they have.

Furthermore, the record is replete with evidence that the RCSD did attempt to accommodate plaintiff's alleged disability. As Dr. Utell noted, the District had "very comprehensive reviews" made of the air quality at Jefferson and Thomas, which failed to identify any contaminants that would account for plaintiff's symptoms. A study of the environment at Thomas undertaken by the Monroe County Department of Health found that the building was "well ventilated," had "clean and well-maintained air handling units," and found no "situations that could produces [sic] deleterious impacts to students or staff." RCSD's Ex. 16. Moreover, plaintiff's transfer to Thomas was itself an attempt to accommodate plaintiff, who by that time was asserting in effect that he was allergic to the entire Jefferson school building. The accommodation sought by plaintiff-transfer back to Franklin-was not required of the District, particularly since there was no opening there for a technology teacher. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir.1999) (employer need not reassign disabled employee if no position is vacant, nor is employer obliged to create a new position to accommodate employee); *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035 (2d Cir.1993) ("reasonable accommodation generally does not require an employer to reassign a disabled employee to a different position").[24]

---

**24.** Plaintiff does not appear to argue that he is disabled because he was "regarded [by defendants] as having such an impairment." 42 U.S.C. § 12102(2)(C). Whether he does or not, however, there is no evidence to support such a finding, since the record does not show that defendants treated his asthma as if it did substantially limit a major life activity, that their attitudes toward plaintiff's asthma caused the asthma to amount to such a limitation, or that they otherwise treated plaintiff as having a substantially limiting impairment. *See* 29 C.F.R. § 1630.2(1). Rather, the record shows conclusively that defendants believed that plaintiff's asthma was *not* severe enough to substantially limit his ability to work or breathe, and that, if anything, they have tended to doubt the credibility of his complaints. *See, e.g.,* Evangelista Aff. 85 (stating that affiant, as a layperson, has "no way of knowing whether Murphy's breathing problems at Jefferson Middle School in September 1999 were in fact feigned or were psychosomatic in character, as seems probable"). *See Rhoads*

## IV. Plaintiff's Retaliation Claims

In addition to his claims of discrimination, plaintiff alleges that the RCSD has retaliated against him for complaining about being discriminated against. These retaliation claims are asserted under Title VII, the ADA, the Rehabilitation Act, and the HRL. The standards for retaliation claims under all these statutes are the same. *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) ("Claims for retaliation [under the ADA, Rehabilitation Act, and HRL] are analyzed under the same burden-shifting framework established for Title VII cases"); *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 148–49 (2d Cir.2002) (elements of a retaliation claim under Rehabilitation Act are same as under the ADA); *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 234 (2d Cir.2000) (applying ADA analysis to plaintiff's retaliation claim under both ADA and NYHRL).

To make out a prima facie claim for retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 113 (2d Cir. 2000). A causal connection can be established directly through evidence of retaliatory animus or "indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Id.* at 117; *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991).

There is no dispute here that plaintiff has complained about being discriminated against, and the District has been aware of his complaints. Nonetheless, plaintiff has failed to identify any particular protected act or acts which he asserts led to the alleged retaliation. He simply asserts generally that defendants have retaliated against him.

Where plaintiff's claim truly falters, however, is on the other two elements: an adverse employment action and a causal connection between his complaints and the adverse action. As explained above in connection with plaintiff's discrimination claims, Murphy's transfers to and from various schools cannot be considered adverse because there is no showing that plaintiff lost "some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment.'" *Alfano,* 294 F.3d at 373 (quoting *Karibian,* 14 F.3d at 778).

 Furthermore, even if plaintiff's transfers, or any of the other matters of which he complains, could be considered to be adverse employment actions, and even if his claim concerning his suspension were

*v. F.D.I.C.,* 257 F.3d 373, 391 (4th Cir.2001) (plaintiff failed to show that her employer erroneously believed that she was substantially limited in her ability to work, because "the record indisputably reveal[ed] that her employer] thought the plaintiff was capable of performing her job in a smoke-free environment," nor could plaintiff establish that her employer mistakenly believed that she was substantially limited in other major life activities, such as breathing, because "the evidence show[ed], at best, that [the employer's] officials knew she suffered from smoke-induced asthma and migraines, but doubted her declarations pertaining to the severity of her condition"), *cert. denied,* 535 U.S. 933, 122 S.Ct. 1309, 152 L.Ed.2d 219 (2002); *see also Cavallaro v. Corning, Inc.,* 93 F.Supp.2d 334, 345 (W.D.N.Y.2000) ("the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action") (quoting *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996)).

not untimely, there is insufficient evidence to create an issue of fact about whether these actions were taken for a retaliatory purpose.

First, as with most of plaintiff's claims, the Court's analysis of this issue is hampered by plaintiff's broad, generalized allegations. Just as he has failed to identify any particular protected activity as the basis for his retaliation claim, plaintiff does not single out any particular alleged adverse action as retaliatory. Instead, throughout his papers, he simply repeats his pet phrase, "discriminatory/retaliatory/unlawful conduct," Plaintiff's Brief at 22, (a label which he applies to virtually every action taken by defendants which plaintiff does not like), leaving it to the Court to guess which acts plaintiff believes were retaliatory.[25]

Even assuming that plaintiff alleges that *all* the acts of which he complains were motivated at least in part by retaliation, the evidence fails to support his claims. As for direct evidence, plaintiff makes much of the deposition testimony of Mary Lou Bliss, a special education teacher at Franklin, who testified that Powell stated to her on a number of occasions that plaintiff was a "troublemaker." Plaintiff's Ex. 220.[26]

When Bliss's testimony about these statements is read in context, however, it is apparent that Powell did not consider plaintiff to be a troublemaker because of plaintiff's opposition to unlawful discrimination, but in connection with "school-based" planning, in which teams of administrators, teachers, parents and students at each school are used to help determine policies to be implemented at that school. According to Bliss, Powell "was trying to say that Murphy was causing trouble in School–Based, and if he [*i.e.,* plaintiff] wasn't there, you know, things would work." *Id.* at 98. Bliss stated that Powell "reiterated that he [Powell] did not believe in shared decision-making and—you know, which is basically what School–Based is supposed to be." *Id.* Bliss (who stated that she, like plaintiff, was a proponent of school-based planning) also testified that "probably every three weeks or so" she and Powell would "regularly get into conversations" about school-based planning, and that "Murphy would come up" in those conversations. *Id.* 100–01. She stated that Powell would say, "Murphy is a troublemaker. He's a thorn in my side." *Id.* at 102. According to Bliss, Powell "really didn't like Murphy; he made that clear." *Id.* She also said that eventually, Powell "began to express his displeasure with" Bliss because of their disagreements over school-based planning. *Id.* at 101.

Plainly, then, Powell's comments had nothing to do with any protected activity on plaintiff's part. Plaintiff and Powell simply did not see eye-to-eye about school-based planning, and Powell had grown to dislike plaintiff. Not all animus is prohibited by the civil rights laws, however. It is only when that animus is based on a person's race or other protected category that those laws afford a remedy. There is no indication here that Powell's enmity toward plaintiff was based on any such factors.

As stated, a causal connection can also be established indirectly, typically either

---

**25.** Other variations include: "unlawfully, discriminatorily and/or retaliatorily," Plaintiff's Brief at 1; "discrimination/retaliation/harassment," Plaintiff's Brief at 22; "discrimination/retaliation/unlawful acts," Plaintiff's Reply Brief at 32; and "discrimination/retaliation/hostile environment," Plaintiff's Reply Brief at 11.

**26.** Bliss's own Title VII and other claims against the RCSD, Powell, and 22 other defendants were dismissed by this Court in *Bliss v. RCSD,* 196 F.Supp.2d 314 (W.D.N.Y.2002).

by showing that an adverse action followed on the heels of some protected activity, or by showing disparate treatment of coworkers who engaged in similar conduct. Again, such evidence is lacking here. First of all, plaintiff's initial lawsuit was filed in 1993, years before the events at issue in the case at bar. In addition, this action was filed in 2000, *after* plaintiff's transfer from Franklin to Jefferson. Although plaintiff complains of virtually everything that occurred in the years both before and after he commenced this action, there is no evidence that any adverse action so closely followed protected activity by plaintiff as to give rise to an issue of fact in this regard.

If anything, the timing of the relevant events tends to support defendants' asserted reasons for taking the actions they did. For instance, plaintiff's suspension in October 1998 closely followed his alleged threat to "hurt a kid," and his transfers occurred after Powell was informed by Bell that the number of teachers being assigned to Franklin for the 1998–99 academic year was dropping from 52.6 to 43.2. At any rate, even if plaintiff had made out a prima facie case, he has not submitted sufficient evidence, in the face of defendants' proffered reasons for their actions, to give rise to an issue of fact about whether those reasons are a pretext for retaliation.

## V. Plaintiff's Claims Against the RTA

■ To the extent that plaintiff's discrimination and other claims are asserted against both the District and the RTA, his claims against the RTA are also dismissed for the reasons given. Several things need to be added regarding his claims against the RTA, however.

First, the RTA interprets at least some of plaintiff's claims as asserting that the RTA breached its duty of fair representation to plaintiff. While plaintiff has asserted a breach of contract claim against the

RTA, as in *Seils*, he has "failed to elucidate ... the precise nature of these obscure claims." 192 F.Supp.2d at 120. It does not appear, however, that plaintiff is asserting a claim for breach of the duty of fair representation as such.

Exactly what plaintiff *is* alleging with respect to the RTA is difficult to discern. As with most of his discrimination claims, plaintiff simply lumps the RTA in with the District and the individual defendants, and alleges that they all somehow discriminated against him. In addition to the reasons already given for dismissing those claims, plaintiff's claim against the RTA is also dismissed because there is no showing that the RTA had any involvement in the acts about which plaintiff complains. It was the District and its employees who made the decisions concerning plaintiff's assignments, transfers, classrooms, etc., not the RTA.

Plaintiff does make some specific allegations against the RTA in his motion papers, although it remains difficult to tell precisely what the legal theory of his claims are, or how they relate to any of the causes of action contained in the complaint. Plaintiff alleges that the RTA, acting "in concert" with the RCSD, somehow violated plaintiff's rights by *continuing* to represent plaintiff in the course of some of his disputes with the RCSD. Plaintiff alleges that the RTA had a conflict of interest because it had been a defendant in plaintiff's prior lawsuit, notwithstanding the fact that the suit had been settled.

■ This "claim" is so murkily expressed that it is difficult even to discuss it. Plaintiff seems to argue that defendants' conduct was unethical, that it somehow constituted a breach of contract, and that it deprived him of his Sixth Amendment right to counsel. The Court fails to see how any of these allegations state a claim against the RTA or anyone else,

however. For one thing, there is no evidence to rebut the RTA's assertion that it is a private, non-governmental entity[27], and other than plaintiff's conclusory assertion that the RTA was working "in concert" with the RCSD (even while representing plaintiff in his grievances *against* the RCSD), there is no evidence that the RTA conspired with the RCSD to deprive plaintiff of his rights, or that the alleged conspiracy had anything to do with plaintiff's race or other protected classification. There can be no liability, therefore, under either § 1983 or § 1985. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bliss,* 196 F.Supp.2d at 336 (finding that RTA was not state actor for purposes of § 1983 claim); *Seils,* 192 F.Supp.2d at 122 ("In order to satisfy the second element of a § 1985(3) claim, 'the conspiracy not only must have as its purpose the deprivation of equal protection of the laws, or of equal privileges and immunities under the laws, but also be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action'") (quoting *United Bhd. of Carpenters & Joiners,* 463 U.S. 825, 829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)) (second internal quotes omitted); *see also Hernandez v. City of Rochester,* 212 F.Supp.2d 143, 147 (W.D.N.Y.2002) ("Conclusory, vague and general allegations of conspiracy are not sufficient to establish the existence of § 1985 violations").

As this Court noted in *Bliss* and *Seils,* a plaintiff who is not asserting a fair-representation claim as such may nonetheless assert a Title VII claim against a labor union based on that theory. As did the plaintiffs in those cases, however, plaintiff in the case at bar has failed even to make out a prima facie case.

In order to establish a claim under Title VII stemming from a union's breach of its duty of fair representation, a plaintiff must show: (1) that the employer committed a violation of the collective bargaining agreement with respect to the plaintiff; (2) that the union permitted that violation to go unrepaired, thus breaching its own duty of fair representation; and (3) that the union was motivated by animus with respect to some protected classification such as race or gender or age. *Bliss,* 196 F.Supp.2d at 335.

There is no showing here sufficient to make out a prima facie case. For one thing, the record reveals that the RTA *has* represented plaintiff with respect to the various actions of the District at issue (indeed, as noted above, plaintiff seems to argue that they should *not* have done so). It is also apparent that the RTA did so more than adequately, as it investigated and pursued the many grievances filed by plaintiff against the District. Moreover, whatever the RTA allegedly did or did not do, plaintiff has proffered *no* admissible evidence demonstrating that the RTA was in any way motivated by unlawful discrimination or retaliation. In fact, although this could fairly be said about many aspects of plaintiff's claims, it is difficult at times to understand why the claims against the RTA are even present in this action.

## VI. Plaintiff's Other Federal Claims

In addition to the claims addressed above, plaintiff's papers also allege viola-

27. In response to the RTA's assertion that as a private entity it cannot be held liable under § 1983, plaintiff responds merely by citing cases applying *state* law, plus *United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), which plaintiff cites for the proposition that "unincorporated labor associations are subject to suit in federal court." Plaintiff's Reply Brief at 29. That principle is entirely beside the point of whether a private entity like the RTA is subject to *liability* under § 1983.

tions of several other of his constitutional rights, including his rights to due process, free speech, to petition for redress of grievances, freedom of association, and equal protection. In one of the more bizarre twists in this case, plaintiff also now attempts to assert a claim, which is not contained in the complaint, that defendants have violated the Establishment and Free Exercise Clauses of the First Amendment by allowing the teaching of religion in public schools. These claims require scant discussion.

■ With respect to due process, a plaintiff asserting such a claim "must show that [he] has a property interest, created by state law, in the employment or the benefit that was removed." *Bernheim v. Litt,* 79 F.3d 318, 322 (1996). The court in *Bernheim* noted that under New York law, "the concept of tenure in the teaching profession 'does not entitle a teacher to a specific class or proscribe assignment to proper duties of a teacher other than classroom teaching of a specific subject.'" *Id.* at 322–23 (quoting *Adlerstein v. Board of Educ. of New York City,* 64 N.Y.2d 90, 99, 485 N.Y.S.2d 1, 474 N.E.2d 209 (1984)). Furthermore, the court stated, "where the complained-of conduct concerns matters that are within an official's discretion, entitlement to that benefit arises only when the discretion is so restricted as to virtually assure conferral of the benefit." *Id.* at 323. The court concluded that "acts that are alterations of working conditions ... cannot provide a basis for a constitutional claim and, if in contravention of [the employee's] contractual rights, may be redressed through employee grievance procedures and an Article 78 proceeding in the state court." *Id.* (citing *Giglio v. Dunn,* 732 F.2d 1133 (2d Cir.) (finding that an Article 78 proceeding satisfied the due

process requirement of providing a hearing at a meaningful time and in a meaningful manner), *cert. denied,* 469 U.S. 932, 105 S.Ct. 328, 83 L.Ed.2d 265 (1984)). Since plaintiff here complains only about "features of [his] working conditions, which are not protected by the Constitution," he cannot make out a due process claim. *Id.* at 322 (noting that plaintiff teacher "did not have a right to ... remain in the position of library teacher, be appointed staff developer, have two periods per day to prepare for her classes or to keep her belongings in a particular place area").

■ Plaintiff also fails to adduce facts to support his equal protection claim, for essentially the same reasons that his Title VII and other discrimination claims fail. Although the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam), plaintiff has failed to make such a showing here; he has not shown that he was treated differently from similarly-situated persons, or that any of defendants' actions affecting him were motivated by discriminatory animus or anything other than rational, permissible reasons.

Plaintiff's claims concerning his rights to freedom of speech, association, and to petition for redress of grievances, are equally meritless. These appear to be based on the same allegations underlying plaintiff's retaliation claims. In other words, plaintiff alleges that defendants took action against him to punish him for exercising these rights. As already explained, there is no evidence that defendants took any action against plaintiff for any impermissible motive.[28]

---

**28.** It is also not at all apparent how plaintiff's freedom of association is implicated in this action.

▉ Plaintiff's purported claims based on the Establishment and Free Exercise Clauses are based on the existence of the "Urban Teachers for Tomorrow" program ("the program"), a program administered jointly by the RCSD and Roberts Wesleyan College ("Roberts") in which participants teach in RCSD schools while they study for a Master's Degree in Education at Roberts, and on plaintiff's allegations that he has witnessed public prayers at RCSD graduation ceremonies and the like. While it appears that these claims would be subject to dismissal in any event, both on the merits, *see Witters v. Washington Dep't of Services for the Blind,* 474 U.S. 481, 488–90, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (First Amendment did not preclude state from extending assistance under state vocational rehabilitation assistance program to blind person who chose to study at Christian college to become pastor, missionary, or youth director), and because plaintiff lacks standing to assert them, *see Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 793 (9th Cir.1999) (holding that plaintiff lacked standing to challenge Establishment Clause violation where challenged act was graduation prayer and there was expenditure of tax revenues involved); *Doe v. Duncanville Indep. Sch. Dist.,* 70 F.3d 402, 408 (5th Cir.1995) (holding that plaintiff lacked standing to challenge Establishment Clause violation where challenged act was distribution of bibles on school's premises which did not involve financial interest); *Friedmann v. Sheldon Comm. Sch. Dist.,* 995 F.2d 802, 803 (8th Cir.1993) (holding that plaintiffs lacked standing to challenge Establishment Clause violation where challenged act was reading of invocation or benediction at graduation ceremony), the simple fact is

that they are not pleaded in the complaint, and they are utterly unrelated to the claims that *are* pleaded. Plaintiff's motion papers are not a proper vehicle for raising such claims, and I decline to do so. *See New York City Envtl. Justice Alliance v. Giuliani,* 214 F.3d 65, 67 n. 2 (2d Cir.2000) (declining to consider claim that district court refused to consider because it was not raised in plaintiff's complaint); *Sussle v. Sirina Protection Systems Corp.,* 269 F.Supp.2d 285, 314, 2003 WL 21346935, at *24 (S.D.N.Y.2003) ("We will not consider a retaliation claim which a plaintiff did not include in his complaint and which he presents for the first time in a brief that responds to a motion for summary judgment").

## VII. Claims Against Individual Defendants

▉ In addition to the above mentioned infirmities in plaintiff's discrimination claims, his claims against the individual defendants under Title VII, the ADA, and the Rehabilitation Act must be dismissed because there is no individual liability under any of those statutes. *See Wrighten v. Glowski,* 232 F.3d 119, 120 (2d Cir.2000) (Title VII); *Tomka v. Seiler,* 66 F.3d 1295, 1313 (2d Cir.1995) (Title VII); *Garcia v. S.U.N.Y. Health Sciences Center,* 280 F.3d 98 (2d Cir.2001) ("neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials").[29]

## VIII. Plaintiff's State Law Claims

Plaintiff also asserts a number of claims based on New York law, including claims under the HRL and the CRL, and claims

---

**29.** The RCSD in its brief also argues that the individual defendants cannot be held liable under the ADEA. As noted earlier, plaintiff does not expressly allege a claim under the ADEA, but the RCSD is correct that there is no individual liability under that statute. *See Layaou v. Xerox Corp.,* 999 F.Supp. 426, 433–34 (W.D.N.Y.1998), *aff'd,* 2001 WL 1836173 (2d Cir. Jan.18, 2001).

for breach of the parties' earlier settlement agreement, breach of plaintiff's employment contract, and defamation. Since plaintiff's federal claims have all been dismissed, however, I decline to exercise jurisdiction over his state law claims, and they are dismissed. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"); *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990) ("It is well settled that 'if the federal claims are dismissed before trial ... the state claims should be dismissed as well' ") (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); 28 U.S.C. § 1367(c)(3).

## CONCLUSION

The motions for summary judgment by the Rochester Teachers Association, Adam Urbanski, and Martha Keating (Docket # 208), and by the Board of Education of the Rochester City School District and the remaining individual defendants (Docket # 196) are granted, and the complaint is dismissed.[30]

Plaintiff's motion for partial summary judgment and for injunctive relief (Docket # 215) is denied. Plaintiff's motion to re-open discovery and to compel discovery (Dkt.# 275) is denied.

IT IS SO ORDERED.

---

**30.** In their motion for summary judgment, the RTA defendants also request attorney's fees as prevailing defendants under Title VII. Although defendants have advanced at least colorable arguments in favor of such an award, in the interests of judicial economy I will defer deciding defendants' request pending the outcome of an appeal, if any, or until after plaintiff's time to appeal has expired. *See* Fed.R.Civ.P. 54; *Hipp v. Liberty Nat. Life Ins. Co.,* 65 F.Supp.2d 1314, 1323 (M.D.Fla.1999) ("In the interests of judicial economy, the Court will ... defer ruling on costs and attorneys' fees until all appeals have been resolved"), *aff'd in part, rev'd on other grounds in part,* 252 F.3d 1208 (11th Cir.2001).